**FREDERICK L., a minor by his mother, Delores L., on behalf of himself and all others similarly situated, and Delaware Valley Association for Children with Learning Disabilities, Plaintiff-Intervenor,**

v.

**Arthur THOMAS, Individually and in his capacity as President of the Board of Education of Philadelphia, et al.**

**The Commonwealth of Pennsylvania ex rel. Israel Packel and John C. Pittenger, Defendant-Intervenor.**

Civ. A. No. 74–52.

United States District Court, E. D. Pennsylvania.

Aug. 2, 1976.

H. David Kraut, Stephen F. Gold, Community Legal Services, Philadelphia, Pa., for plaintiffs.

Stephen Miller, Education Law Center, Inc., Philadelphia, Pa., for plaintiff-intervenor Dela. Valley.

Robert T. Lear, Law Department School District of Philadelphia, Philadelphia Pa., for defendant.

Stinson W. Stroup, Maria P. Vickers, Asst. Attys. Gen., Philadelphia, Pa., for Commonwealth.

## MEMORANDUM AND ORDER

NEWCOMER, District Judge.

This lawsuit involves the education of children and adolescents with specific learning disabilities (LD's) in the School District of Philadelphia (District).[1] The complaint alleges that the District does not have a remedial program for learning disabled children which satisfies Pennsylvania's special education statutes. It further alleges that the District has violated plaintiffs' rights under the United States Constitution.[2]

A trial of issues raised by the class action claims in this suit was held between September 29, 1975, and October 9, 1975.[3] Two nationally recognized experts in the field of specific learning disabilities testified at length. Dr. Nettie Bartel, Chairperson of the Department of Special Education, Temple University, was called by the plaintiffs. Dr. Donald D. Hammill, Assistant Professor in Mental Retardation, University of Texas, testified in the Commonwealth's case. Plaintiffs' other witnesses were: Dr. Milton Brutton, Clinical Director of Vanguard School, Paoli, Pennsylvania; Mrs. Willetta Silva-Shadday, Itinerant Teacher, Cornman Diagnostic Center, School District of Philadelphia; Mr. Richard McCarthy, Administrative Officer, Division of Special Education, Pennsylvania Department of Education; and Mrs. Delores L., mother of the representative plaintiff. Mr. David A. Horowitz, Associate Superintendent of the Philadelphia Public School Systems, and Mr. Harry Gerlach, Deputy Commissioner of Basic Education in Pennsylvania, testified for the District and for the Commonwealth respectively.

Upon consideration of the testimony, the exhibits introduced into evidence, and the proposed findings submitted by counsel, the court makes the following

## FINDINGS OF FACT

*Class Characteristics*

1. This action is brought on behalf of the class of all children attending public schools within the City of Philadelphia who

1. There is no substantial controversy about the adequacy of educational opportunities for children in grades K–4. The primary purpose of the suit is to force the District to expand and upgrade its remedial services for children and adolescents in grades 5–12.

2. The plaintiffs' constitutional claims are summarized in the Court's Memorandum and Order of January 7, 1976.

3. The representative plaintiff also has sued on his own behalf for damages and injunctive relief.

have "specific learning disabilities" and who are deprived of an adequate and appropriate education for their specialized needs.

2. For the purposes of this litigation the parties accept the definition of children with specific learning disabilities adopted by the Pennsylvania Department of Education. This definition states:

"Learning disabled pupils are those children who have a disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, which disorder may manifest itself in imperfect ability to listen, think, speak, read, write, spell, or do mathematical calculations. Such disorders include such conditions as perceptual handicaps, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia. Such term does not include children who have learning problems which are primarily the result of visual, hearing, or motor handicaps, or mental retardation, or emotional disturbance, or of environmental disadvantage."

3. Though of normal or potentially normal intelligence, children with learning disabilities may not interpret what they hear or see in the same way as children of equal intellectual ability. They may develop language disorders—the inability to understand, assimilate, interpret or retain the speech of others in the same way as normal children. They may have difficulty engaging in abstract thinking or expressing their ideas in a form comprehensible to others.

4. A learning disability is a gap in a person's psychological processes. For example, a learning disabled child may look normal and use language in a way that is typical for his age, yet any of the methods used in the regular classroom to teach him how to read may get nowhere.

5. Professionals infer brain injury in children who are learning disabled, because 70 to 80 percent of such children exhibit "soft signs" (e. g. behavioral indicators) of mild neurological impairment. Also, 80 to 100 percent of children who are learning disabled will have abnormal electroencephalograms. Brain injury is a medical term which emphasizes the cause of what is also known as a learning disability. One widely believed theory is that learning disabilities are caused by damage to the central nervous system before or during the birth process or by disease during the child's early life. However, although all children with learning disabilities are inferred to be brain injured, some brain injured children may not be learning disabled, but may have cerebral palsy or may be mentally retarded. Educators use the term, learning disabled, because the focus of their effort is to identify and remediate the learning problem caused by the presumed neurological impairment.

6. According to the consensus of experts in the field, the nationwide incidence of learning disabled children is 1% to 3%. The correct figure could be as high was 7%.

7. In a city such as Philadelphia the incidence of learning disabilities in the public school population usually exceeds the national average. Two reasons for this phenomenon are: (a) In a city with a large number of poor people one expects to find lower quality of prenatal and natal care, and a higher incidence of birth injuries and early diseases which go unidentified and/or untreated. (b) Philadelphia has a large parochial school system which tends to enroll and hold on to normal students and rely on the public schools to education exceptional children.

8. The best estimate of the incidence of learning disabled students in the Philadelphia School District is 3%. With an enrollment of 263,000 pupils, the District has approximately 7,890 LD's.

9. As children with learning disabilities enter the upper elementary and early junior high years, some of the behavioral signs of their learning disabilities will "soften" or disappear because of the effect of developmental factors based on age. For example, a child will tend to develop more control over his impulses. As a statistical matter, the percentage of learning disabled children identified in a school population varies in-

versely with age. In the case of any particular student, however, his learning disability is not likely to disappear with age absent some form of intervention.

10. As they grow older, children with learning disabilities who are not helped are likely to continue falling behind in their school work. (The academic performance of the named plaintiff Frederick L., is typical of this phenomenon.) A hard working student can regress. Failure can cause frustration, loss of self esteem, and antagonism towards adults.

11. In order to call attention to the seriousness of the problem of learning disabilities among adolescents, Dr. Hammill has suggested to the profession that it refer to learning disabled "students," rather than to learning disabled "children."

12. There is little controversy concerning the proper education and training of students with *serious* learning disabilities. As the problems become less severe, the amount of controversy increases proportionately. There is general agreement among professionals about what programs are appropriate for educating the 3% of the school population considered to be seriously learning disabled.

13. As a part of planning remedial educational services, a professional judgment has to be made about the state of the art of instructional services which benefit children in different age groups. When the art is undeveloped, it is an accepted educational practice to begin an experimental program with younger children, and to expand it one grade upwards per year, following the path of the first group of children (as it grows up). A disadvantage of this approach is that pupils who are in the older age groups at the beginning years of the program never receive its benefits. Ordinarily, this situation is not acceptable from a professional viewpoint (aside from administrative and financial limitations) if there are viable methods of remedial instruction for the older students.

14. Curriculum materials and the know-how are available to implement programs for students of all ages with learning disabilities. Although the profession has more experience with elementary school age pupils, Drs. Bartel and Brutton referred to programs for secondary students operating in Minneapolis, Houston, Pittsburgh, and other cities. Dr. Hammill stated that secondary programs can now be rapidly developed, and he expects that they will be appearing in large numbers. The District has stipulated with the plaintiffs that it is feasible to have a program for adolescents with learning disabilities.

15. Emotionally disturbed persons have personal or social adjustment problems which prevent them from functioning to their capacity. A learning disabled child's frustrations in the classroom can cause him to become emotionally disturbed. Psychologists can distinguish between children whose learning problems are the result of emotional disturbance from children whose emotional problems are the result of a learning disability. Historically, classes for the emotionally disturbed children have emphasized psychiatric assistance. Recently, there has been substantial concern about the educational lags of the emotionally disturbed child. Therefore, it cannot be assumed that placement of a learning disabled/emotionally disturbed child in a class for the emotionally disturbed is either appropriate or inappropriate. However, such placement is probably *less* appropriate than special instruction directed at the pupil's learning problems.

16. Mental retardation is a pervasive cognitive deficit. Even with the benefit of early and proper instruction, mentally retarded children have a limited prospect for academic progress.

17. The District provides adequate and appropriate education for all mentally retarded children. (Stipulation).

18. Children and adolescents with learning disabilities can usually become literate when provided with special education.

19. The cost of educating a learning disabled child is equivalent to the cost of educating other exceptional children.

20. Children who are mentally retarded or who have an emotional disturbance (not caused by a learning disability) may also be learning disabled.

21. A learning disabled student whose problem is not being remediated is likely to have great difficulty trying to read, and may be unable to do such a simple mathematical calculation as making change.

### Identification of Specific Learning Disabilities

22. Three methods for identifying learning disabled pupils are: screening by test results; teacher referrals; parent referrals.

23. A test-screening program written by Dr. Nettie Bartel would be an effective means for identifying all learning disabled pupils in the district. In this program, all pupils performing in the lowest percentiles on certain standardized achievement tests would be identified initially. Other information about this group would be evaluated, so that pupils whose poor achievement was caused by low intelligence, sight or hearing handicaps, or lack of motivation, would be screened out. The remaining children and adolescents would be examined by psychologists to determine whether they were learning disabled. (Stipulation between plaintiffs and District).

24. No test-screening program comparable to the Bartel Proposal is in effect for the District, or is planned for implementation.

25. The District primarily relies on the teacher referral method for identifying its learning disabled students. According to Dr. Hammill, teacher referral generally is an adequate method for identifying students with severe and moderate learning disabilities. Drs. Brutton and Bartel testified that teacher referral was not an adequate method for identifying LD's in the District.

26. Drs. Hammill, Bartel, and Brutton made different factual assumptions when they rendered their opinions about teacher referrals. On close examination, the divergence of opinion is not based on substantially different theoretical viewpoints. The experts agree that the average classroom teacher can identify a child that is having trouble in school. But she cannot, without special training, diagnosis the *cause* of the problem. Dr. Hammill testified that teachers refer to diagnosticians, children who exhibit the behavioral characteristic of severe and moderate learning disabilities. However, Dr. Hammill also said he was not familiar with practices in Philadelphia or with the extent of services available for learning disabled children in the District.

27. The plaintiffs controverted Dr. Hammill's statement about teacher practices by adducing testimony from persons with direct knowledge of the District—Dr. Bartel, Dr. Brutton, Mr. Horowitz, and Mrs. Silva-Shadday. Based on this testimony we find that teachers frequently do not refer students who may be learning disabled because:

(a) Teachers in the District are most likely to use psychological referrals for children whose behavior makes it difficult or impossible for the teacher to instruct the rest of the class. Students who are not functioning academically but also are not aggressive, are frequently promoted through the grades without a psychological referral.

(b) If the teacher does not believe there is a suitable program in which to place a child, she often will not make a psychological referral.

28. It is disputed whether parent referrals through parent-initiated due process hearings are an effective method for identifying LD's. There is not enough experience with the due process procedures to make definitive findings on this question. To utilize the procedure the parent has to (a) recognize her child is not functioning academically, (b) recognize that the cause of the child's underachievement may be something that requires special education instruction, (c) know that due process hearings are available, (d) believe that through a due process hearing her child—though not a severe behavior problem—may receive special help, (e) properly carry out the procedures for initiating the hearing, which

includes obtaining an expert psychiatric opinion.

*School District Services*

29. The District provides a variety of remedial services which reach some of its learning disabled students. These services fall into two categories. First, services designated as special education are available only to children who have been identified as exceptional. Second, general remedial programs, not designated special education, are furnished to children who have not been labeled learning disabled. An unknown number of unidentified learning disabled pupils are included in general remediation programs. This raises two. questions: (a) How many unidentified learning disabled pupils are in a general remediation program? (b) How valuable are general remediation services for overcoming specific learning disabilities? The evidence on these questions is inconclusive.

30. Table I, *infra* at 968–969, summarizes the services in the first program category, that is, in programs specifically designated for the learning disabled. The District has conceded that no special education support services which are specifically directed at the remediation of learning disabilities exist in the public schools for students above grade 7 and that only a' small number of students in grades 5 and 6 receive special education support services directed at learning disabilities.

31. Programs which fall into the second category—general remedial services reaching some unidentified learning disabled students—are summarized in Table II, *infra* at 969–970.

32. The primary eligibility criterion for placement in one of the programs listed in Table II is "underachievement." The District considers approximately 40% of its enrolled pupils to be underachieving. Given 263,000 pupils, the students for Table II programs are drawn from a pool of 105,200 pupils. It is estimated that there are 7,890 learning disabled pupils in the District.

These figures imply that only a small proportion of unidentified learning disabled children are receiving general remedial services. The defendants have not produced evidence that dispells this inference.

33. Table III, infra at 970, represents the level of services proposed by the District for 1975–76 in its Needs Budget, submitted to the Department of Education in June, 1975. In the words of Dr. Horowitz, the program levels were a "computation of what we really needed and what we would really deliver to the school children of Philadelphia." (R. 439).

34. The 1975–76 District Needs Budget Plan would, if implemented, provide LD's with appropriate education. (Stipulation). It has not been implemented.

35. It follows from Finding No. 34 that the first alternative plan would provide appropriate education for LD's no later than in its third year. This plan is not being implemented. Although District programs have expanded in 1975–1976, the degree of expansion is far from what would reasonably be expected in the first year of a three year phasing-in of the primary plan.

36. ·The preamble to the second alternative plan states:

"However, if this kind of coordinated L.D. program is not seen as possible within the next few years, *some of the children needing this program* could be provided for by . . . ." (emphasis supplied) Defendant Exhibit 2.

Hence, this plan does not even purport to be one that would provide appropriate education for *all* LD's. Part II of this plan has been implemented. Parts I and III have not been fully implemented. There is no evidence above Part IV.

*State Financing Procedures*

37. The School District of Philadelphia is responsible for the Philadelphia Intermediate Unit. The intermediate units are charged with providing the special education services mandated by state law. Pursuant to 24 P.S. § 13–1372(5), if the Super-

intendent of Public Instruction (Superintendent)[4] determines that an Intermediate Unit is failing to fulfill that duty, the Department of Public Instruction (Department)[5] may assume control of the unit. No such takeover has been attempted or suggested with respect to Philadelphia.

38. Prior to the financing of the 1973–1974 special education programs, the Department approved budget requests submitted by districts or intermediate units to the extent that they were legal expenditures, i.e. they were earmarked for purposes which fit into the statutory categories for which state moneys could be spent. A result of this procedure was that the amount of money approved by the Department sometimes exceeded the then current legislative appropriations. It became necessary to ask the Legislature for supplemental appropriations to eliminate the deficiencies.

39. With the advent of the 1973-1974 programs, the Department eliminated deficiency allocations. Since that time, the budget allocation has been based on a flat percentage increase over the prior year appropriations. (This assumes that the costs have been appropriately identified and that the budget request equals or exceeds the figure arrived at under the fixed state formula).

40. Within the Division of Special Education of the Pennsylvania Department of Public Instruction, the official who reviews the educational plan submitted by the district or intermediate unit pursuant to 24 P.S. § 1372(2), is not the person who reviews the budget submitted in conjunction with the plan and who calculates the allocation for that budget (using the method described in the preceding finding of fact).

41. The State Board of Education passed regulations effective September 1, 1975, mandating that there be appropriate programs of education and training for all handicapped children including the brain injured learning disabled.

42. Pursuant to 24 P.S. § 1372(2), the Intermediate Unit of the School District of Philadelphia submitted to the Department a 1975–1976 plan which provided for the proper education and training of all public school students in Philadelphia with specific learning disabilities. Accompanying the plan was the "Special Education Needs Budget." The budget was based on an assessment of needs determined by principals, by specialists in the Division of Special Education, and by District psychologists. It was based upon the best estimates available to the School District on the number of handicapped children which should and could be served.

43. The needs budget requested an expansion in the number of itinerant teachers to 64. It requested an increase of 215 classes and 204 resource rooms for learning disabled students.

44. The Department reviewed the plan and budget in accordance with the bifurcated procedure described in Finding of Fact No. 40. The Department approved the plan. However, it allocated funds in an amount which did not take into account either the plan submitted pursuant to 24 P.S. § 1372(2) or the budget necessary to implement the plan. The allocation did not allow expansion of existing special education programs because the increase in funding was not as great as the increase in the cost of providing services at the same level as the previous year.

45. The District has taken the position that:

"The Commonwealth did not provide, and made no attempt to provide, funds adequate to implement its own regulations requiring appropriate education for children with specific learning disabilities." Defendant's Proposed Finding of Fact No. 8.

The District did not substitute other funds for the short-fall in the Department's allocation.

---

4. The powers and duties of the Department of Public Instruction reside in the Department of Education (which was created in 1969). The Superintendent is, ex officio, the Secretary of Education. 71 P.S. §§ 1037–1039 (Supp.1976).

5. *Id.*

46. Although the local intermediate unit is given the authority to determine budget allocations among various exceptional children, depending upon the intermediate unit's priorities, the Commonwealth has required that priority be given to services for the mentally retarded as a result of the P.A.R.C. Consent Decree. The Commonwealth has not permitted services for the mentally retarded to be cut back or decreased in any manner.

47. Ferman B. Moody, Director of the Bureau of Special and Compensatory Education in the Department of Education, the Special Education State Advisory Committee, and the staff of the Division of Special Education, stated in an internal memorandum dated August 6, 1974, that: (a) state laws which provide for the education and training of all exceptional children have not been enforced; (b) exceptional children other than the mentally retarded are discriminated against by the Commonwealth in the planning and programming of special education; (c) the Commonwealth of Pennsylvania is lagging behind other states in providing education for all its exceptional children; (d) all children with learning disabilities should be provided with an appropriate education.[6]

TABLE I

SPECIAL EDUCATION SERVICES FOR LEARNING
DISABLED STUDENTS
1973–1976

| PROGRAM | STUDENTS RECEIVING SERVICES | |
| --- | --- | --- |
| | Elementary | Secondary |
| 1. Self-contained[1] Classrooms | | |
| 1973–1974 | 157 | 0 |
| 1974–1975 | 357[2] | 0 |
| 1975–1976 | 616[3] | 0 |
| 2. Resource Rooms[4] | | |
| 1973–1974 | NE* | NE |
| 1974–1975 | 160[5] | 0 |
| 1975–1976 | NE[6] | 0 |

Footnotes for Table I
* No evidence

1. Instructors have special education certification.

2. Thirty-eight classrooms. These figures are based on the testimony of Dr. Horowitz. The official District Budget for 1975–1976 states that only 195 children were in LD self-contained classes. Defendant-intervenor Exhibit II. This discrepancy was not explained.

3. Eighty-two rooms.

4. Resource rooms are centers that LD's may attend for a portion of the school day, spending the rest of the day in basic education. The length of time in the center depends on the child's needs.

5. Resource rooms also serve non-LD exceptional children. By stipulation, it is estimated that one-third of a total of 480 children served were LD.

6. Dr. Horowitz testified that eighteen resource rooms were being added in 1975–1976.

---

6. The authenticity and admissibility of the Moody Memorandum was stipulated to with the condition that it would not be offered as an official statement binding on the Commonwealth, but rather as Mr. Moody's legal opinion, from which the Court could—if appropriate—draw its own conclusions.

| PROGRAM | STUDENTS RECEIVING SERVICES | |
| --- | --- | --- |
| | Elementary | Secondary |
| 3. Private Schools [7] | | |
| 1973–1974 | | |
| 1974–1975 | 700 | 700 |
| 1975–1976 | | |
| 4. Itinerant Teachers [8] | NE [9] | NE [9] |

Footnotes for Table I

**7.** Instructors have special education certification or comparable qualifications. The figures for students served are estimates.

**8.** Itinerant teachers are supposed to perform a number of functions, including training regular teachers to identify and instruct LD's; teaching LD's; screening LD's. In the past two years the itinerants have spent most of their time doing screenings.

**9.** In 1974–1975 there were six itinerant teachers. They spent the majority of their time screening children in kindergarten and first grade. They did no teacher training. In 1975–1976 there were 12–15 itinerant teachers.

TABLE II
NON-SPECIAL EDUCATION PROGRAMS WHICH
MAY BENEFIT LD'S [1]
1975–1976

| PROGRAM | DEFINITION OF TARGET GROUP | INSTRUCTOR'S QUALIFICATIONS | CHILDREN RECEIVING SERVICE | |
| --- | --- | --- | --- | --- |
| | | | Elementary | Secondary |
| 1. Basic Education [2] | All Students | In-service training | 0 | 0 |
| 2. Checkpoint [3] | Deficiencies in basic skills Grades 1–3 | No spec. ed. training | 1700 | 0 |
| 3. Bench Mark | Deficiencies in basic skills Grades 4–6 | " | 1200 | 0 |
| 4. Achievement for Individual Development (AID) | Deficiencies in basic skills Grades 7 and 8 | Unclear [4] | | |
| 5. Alternative Programs | Underachievers; Children having trouble adjusting to normal school environment | No spec. ed. training | 35 Programs | 100 Programs |
| | | | (Total: 2600 children) | |

Footnotes for Table II

**1.** In most cases, these programs are not intended for LD's who have been identified as LD. The defendants' position is that unidentified LD's in these programs will get instruction that helps to remediate their handicaps.

**2.** It was intended that regular classroom teachers would be trained by itinerant teachers to recognize LD symptoms, and to carry out programs of remedial instruction designed by LD specialists for individual students in their classrooms. However, no in-service workshops have been held since the beginning of the 1974–1975 term. When workshops were held, less than 10% of the basic education instructors attended them.

**3.** The Checkpoint Center Program dated January 1974 states:
"The Centers are not to admit youngsters who qualify for any of the Special Education classes." Plaintiffs Exhibit 6, p. 1.

**4.** AID is part of the Intermediate Unit, but it is unclear whether instructors must have special education qualifications.

| PROGRAM | DEFINITION OF TARGET GROUP | INSTRUCTOR'S QUALIFICATIONS | CHILDREN RECEIVING SERVICE | |
| --- | --- | --- | --- | --- |
| | | | Elementary | Secondary |
| 6. Title I | Economically and educationally disadvantaged; Below 33rd percentile in standardized tests | Many are remedial math and reading specialists: Special ed. training not required | 130,000, total[5] (Services in 140 out of 300 school organizations). | |
| 7. Speech Therapy | Children with speech problems | Speech therapists | 123 full time therapists | |

Footnotes for Table II

5. Approximately 15,000 additional students are served in Title I funded private school placements.

TABLE III

SUMMARY

DISTRICT NEEDS BUDGET 1975–1976

Learning Disabilities

"PLAN"

I. Children to be Served—2,816

    A. 700 children currently receiving services in private schools would be served in new District programs.

    B. 700 new applicants for private school placements will be served in new District programs.

    C. 1,400 non-achieving or poorly adjusting students.

II. Facilities

    A. 8 LD Centers, including approximately 64 intensive classes.

    B. 80 Self-contained classes.

    C. 80 Resource rooms.

    D. 64 Itinerant teachers.

FIRST "ALTERNATIVE PROGRAM"
Phase in the PLAN in two or three years

SECOND "ALTERNATIVE PROGRAM"

    I. 80 Resource rooms (at elementary and secondary levels).

    II. Increase of 30–50 LD classes (Increase of 240–400 children in full-time LD programs).

    III. 20 LD itinerant teachers.

    IV. Approval of large numbers of children for enrollment in private school.

CONCLUSIONS OF LAW

1. Jurisdiction over the subject matter in this case is founded on 28 U.S.C. § 1343(3) and (4); and on 28 U.S.C. § 1331. Jurisdiction over the plaintiffs' state law claims is based on the doctrine of pendent jurisdiction.

2. The plaintiffs' federal claims raise difficult constitutional issues, among them:

a) Is minimally adequate public education a fundamental right?[7]

7. Cf. *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973).

b) Can a handicapped child who is offered the same educational services provided to normal children, be deemed functionally excluded from school and thereby deprived of equal educational opportunity because of his inability to benefit from normal educational services? [8]

c) Assuming that both groups are receiving minimally adequate instruction, what differences in the services provided to normal children and to exceptional children are constitutionally impermissible? [9]

█ 3. As a general rule, a federal court should not decide federal constitutional questions where a dispositive nonconstitutional ground is available, even though the nonconstitutional claims are pendent, and standing alone, are beyond the jurisdiction of the federal court. *Hagans v. Lavine,* 415 U.S. 528, 546, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974).

4. Plaintiffs are entitled to relief pursuant to Pennsylvania law, as more fully set out below.

█ 5. Abstention is not appropriate in this case because the plaintiffs have proved a set of facts establishing liability without relying on unclear parts of the state statutory scheme.[10]

6. The Special Education State Board Regulations (1975 Regulations) were enacted in June 1975, under the authority of 24 P.S. § 13-1372(1) and have the force of law.

7. Plaintiffs, children with learning disabilities, are exceptional children pursuant to 24 P.S. § 13-1371(1). *See also* 1975 Regulations § 13.1.

8. Plaintiffs, children with learning disabilities, are entitled to proper education and training. The concept of appropriate education is defined further in the 1975 Regulations. 24 P.S. § 13-1372(1); 1975 Regulations §§ 13.1, 13.2, 13.11.

9. The School District of Philadelphia is required to identify all learning disabled students. 24 P.S. §§ 13-1371, 13-1372. 1975 Regulations §§ 13.1, 13.6, and 13.9(B).

10. Each learning disabled child does not necessarily have to be given instruction designated special education. However, a determination that a learning disabled student can receive appropriate education without receiving special education instruction, is valid only if it is made after the child's exceptionality has been identified and evaluated. 24 P.S. §§ 13-1371, 13-1372. 1975 Regulations §§ 13.1, 13.6, and 13.9(B).

11. The District is required to prepare plans for the proper education and training of all learning disabled students. The District must provide them appropriate educational services in accordance with a plan approved by the Superintendent of Public Instruction. 24 P.S. § 13-1372.

12. As part of his duty to enforce the provisions of the special education laws, the Superintendent must monitor District services to determine whether they comply with the state-approved plan. If they do not,

**8.** Cf. *Lau v. Nichols,* 483 F.2d 791 (9th Cir. 1973) (*en banc*) *reversed* 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974).

**9.** The problem here is to articulate and to apply the appropriate test under the Equal Protection Clause of the Fourteenth Amendment. If there is a middle test of equal protection, its content and applicability is unsettled. *Compare Massachusetts Board of Retirement v. Murgia,* —— U.S. ——, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) *with Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971) and *Weinberger v. Weisenfeld,* 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975). In recent Supreme Court cases, advocacy of a flexible equal protection test for such groups as women, illegitimates and the elderly has been limited to dissenting opinions. *See Massachusetts Board of Retirement v. Murgia,*

*supra,* at —— – ——, 96 S.Ct. 2562 (Marshall, J., dissenting); *Matthews v. Lucas,* —— U.S. ——, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976) (Stevens, J., dissenting). *Cf. In the Matter of Levy et al.,* No. 21 *et seq.,* 38 N.Y.2d 653, 382 N.Y.S.2d 13, 345 N.E.2d 556 (1976); *Semple v. Miller,* 38 A.D.2d 174, 327 N.Y.S.2d 929 (1972); *Manjores v. Newton,* 64 Cal.2d 365, 49 Cal. Rptr. 805, 411 P.2d 901 (1968).

**10.** Abstention also is inappropriate because defendants raised this issue at a late stage in this litigation. Because no state law claims that are before this court, delay caused by abstention could irreparably harm the plaintiff class. *Frederick L. v. Thomas,* 408 F.Supp. 832 (E.D. Pa.1976).

the Superintendent must take reasonable steps to assure compliance. 24 P.S. § 1372(2) and (3).

13. The District violated its duties to identify all learning disabled students, and to provide them with appropriate education in accordance with an approved plan. The Superintendent violated his duty to enforce the special education laws. These violations establish defendants' liability. Defendants' claim that the plaintiffs are receiving appropriate educational services is relevant to the scope of relief.

■ 14. When educational officials deviate substantially from statutorily prescribed decision-making procedures, the soundness of their ultimate policy determinations is subject to stricter judicial scrutiny than would be applied had the policy been arrived at through correct procedures.

15. Plaintiffs are not being provided appropriate educational services.

## DISCUSSION

School age persons with specific learning disabilities (LD's) are exceptional children, within the meaning of 24 P.S. § 13–1371.[11] The obligations of the Commonwealth of Pennsylvania and of its local school districts to provide instructional services to exceptional children, are set forth in 24 P.S. §§ 13–1371–1377, and in the Special Education State Board Regulations.[12]

This legal framework provides for:

a) Identification of all exceptional children;

b) Systematic (and formal) planning to meet the needs of identified children;

c) Accountability in decision-making;[13]

11. See *infra* at 973.

12. The Regulations are authorized by § 13–1372.

13. The planning mechanism exposes general programming decisions to public scrutiny; due process procedures afford parents the right to challenge specific decisions about pupil placement.

14. The School District of Philadelphia administers the Philadelphia Intermediate Unit. It is unnecessary, therefore, to explore the differ-

d) Entitlement of each exceptional child to an education appropriate to his or her individual needs;

e) Delegation (by the Legislature) to state and local school officials and their professional staffs of the responsibility for determining the content of "appropriate" special education services; and

f) Role allocation (by the Legislature) under which *primary* responsibility for providing special education services lodges with local districts, (and intermediate units[14]) but the Superintendent of Public Instruction is responsible for establishing and enforcing program quality standards.

■ The District's programming for LD's departs from this scheme in at least three important areas. First, all LD's have not been identified. Second, actual programming does not conform to a state-approved plan. Third, neither the professional staff of the Department of Public Instruction, nor of the District, has made a report which assesses the District's LD services and which concludes (with supporting reasons) that these services provide appropriate education.

### Identification of LD's

■ School Districts have a clear duty under state law to identify their exceptional children. Section 13–1371 provides, in pertinent part:

"(2) It shall be the duty of the district superintendent, in every school district . . . [to] report . . . *every* exceptional child within said district." (emphasis supplied)[15]

ences between districts and intermediate units. The Philadelphia School District and Pennsylvania Intermediate Unit # 26 will henceforth be referred to simply as the District.

15. It further states:

"As soon thereafter as possible the child shall be examined by a . . . school psychologist, and also by any other expert which the type of handicap and the child's condition may necessitate . . ."

The term "exceptional children" includes children with specific learning disabilities. The pertinent state regulations are entitled as follows:

### "SPECIAL EDUCATION STATE BOARD REGULATIONS
#### Extending Right to Education
#### to
#### All Exceptional School-aged Persons
#### June 3, 1975"

Regulation § 13.1 begins by stating a general definition of "exceptional persons" which incorporate the statutory language of 24 P.S. § 13–1371. The general definition is then broken down into three subclassifications. Under the first heading, "handicapped school-aged persons," are included:

"Physically handicapped persons who are . . . brain damaged, learning disabled . . ."

The legislature has delegated to the State Board of Education the duty to adopt and prescribe standards and regulations for the proper education and training of all exceptional children. § 13–1372. In § 13.6 of its implementing regulations, the Board designated nine possible placements for handicapped school-aged persons. The alternative which draws on the fewest resources and calls for the least intervention is:

"[attendance in a] regular class in a regular school *with supporting services.*" (emphasis supplied)

The defendants have argued that many learning disabled children do not "require special education facilities or services,"[16] and are not "exceptional children," and therefore do not need to be identified by the District. In its present form, argument must be rejected as contrary to the plain meaning of the language in the above-quoted statutes and regulations. It is true, however, that the district may properly decide that many learning disabled children should only be given minimal special education services. For example, there is ample expert testimony in the record to support the conclusion that some learning disabled students would be afforded appropriate educational opportunities if they were placed in regular classes with "supporting services"[17] consisting of instruction in remedial programs not designated special education. For that matter, appropriate supporting services for some LD's may be nothing more than monitoring their academic performance in regular classrooms so that new learning problems that arise because of their disabilities do not go undetected. Placing exceptional children in regular classes in this manner is called "mainstreaming." Under the regulations, it is a preferred strategy.[18]

We cannot find, however, that learning disabled students whose disabilities have *not* been identified and who are in regular classes, or in general remedial programs, or some combination of the two, are properly "mainstreamed." State Regulation § 13.-9(B) states:

"When mainstreaming is recommended, specific supporting services, *including staff orientation,*[19] necessary for appropriate education and/or training of persons placed in the mainstream shall be provided *in accordance with the nature of the placement.*" (emphasis supplied)

There must first be a diagnosis of the child's exceptionality, and then a determination that mainstreaming under prescribed conditions will be an appropriate placement.

---

Section 13–1372 provides, *inter alia*:
"The State Board of Education shall adopt and prescribe standards and regulations for the proper education and training of *all* exceptional children by school districts . . ." (emphasis supplied)

Section 13–1371, provides in part:
"(1) The term 'exceptional children' shall mean children of school age who deviate from the average in physical, mental, emotional or social characteristics to such an extent that they require special education facilities or services . . ." (emphasis supplied)

**16.** § 13–1371.

**17.** Regulation § 13.6.

**18.** Id. §§ 13.1, 13.6.

**19.** The District's staff training efforts are, at best, minimal. *See* Table II, n. 2.

Of the estimated 8000 learning disabled students in the District, approximately 1,300 have been identified. The remaining 6700 who are unidentified cannot, under the applicable law, be classified as "mainstreamed."

There are thousands of unidentified LD's in the District.[20] It is possible that if they all were identified, the District could make a valid professional determination that they were already in appropriate placements. But the fact is, they are *not* identified, and the law requires that they must be. This does not mean that the task has to be accomplished overnight, or with perfect accuracy. But, at a minimum, the District must have a program reasonably calculated to identify all of its learning disabled students within the near future.

### Planning and Implementation

The planning, budgeting, and implementing of special education programs for LD's should proceed in the following manner. The District takes a census of LD's, pursuant to § 13–1371(2). Its special education experts determine what possible combinations of instructional services would provide the LD population with appropriate instruction. This determination takes place within the framework of instructional standards established by the State Board Regulations. However, to the extent that the standards do not resolve divergent expert views about the nature and treatment of learning disabilities, the District staff can make recommendations based upon its own best professional judgment. District officials draw up a plan which provides—at the least—for minimally appropriate instruction.

The District submits its plan to the Superintendent of Public Instruction,

"for his approval or disapproval . . . in accordance with the standards and regulations adopted by the State Board of Education." § 13–1372(2).

A proposed budget accompanies the plan. The budget includes the costs of maintaining special classes and of providing special

instruction in accordance with the plan. The Department reimburses the District for these excess costs (i.e. the amount by which the cost of special education per pupil exceeds the cost of basic education per pupil) so long as the special services are,

"approved by the Department of Public Instruction as to location, constitution and size of classes, conditions of admission and discharge of pupils, equipment, courses of study, methods of instruction and qualification of teachers." § 13–1373.

If its plan is approved, the District commences implementation. The district must maintain special classes or schools *"in accordance with the approved plan"* (emphasis supplied). § 13–1371(3). If the District finds itself unable to effectuate the approved plan, it can submit a revised plan to the Superintendent for his approval. § 13–1372(2).

Since the District must operate programs in accordance with its approved plan, and the Superintendent must "enforce the provisions of [the] act"[21] it follows that the Superintendent has the duty to monitor the services the District provides. If there is room for disagreement about whether the District's programming is in compliance, the Superintendent has to exercise professional judgment in determining the existence of a violation. Upon a finding of noncompliance, the Superintendent has discretion to choose an appropriate remedy. Section 13–1372(5) authorizes him to substitute a state program for the District program, and to assess costs against the District. Another possible remedy is to order the District to submit a revised plan. However, the Superintendent does *not* have discretion to fail to monitor a local program; to ignore a clear violation of a statute or regulation; or to provide no remedy at all for a recognized violation. The District's duty to provide appropriate educational services in accordance with a plan, and the Superintendent's duty to enforce that obligation, are not

20. They are concentrated in grades 4–12.

21. § 13–1372(3).

contingent upon the Legislature's full funding of reimbursable costs or upon the Superintendent's approval of the District's budget request.

In 1973, the planning/budgeting/programming process began to deviate from the procedures that have just been described. Prior to that time, the appropriations and budgeting process was supportive of the delegation to educational professionals of the task of designing special education programs. The special education field was growing rapidly. Exceptionalities were being better defined and more widely recognized and effective instructional programs were being developed. These improvements in the state of the art made it possible for the District to plan more ambitious special education programs in each successive year. So long as the plan was approved for content, all budget items which fell into the statutorily designated categories were reimbursed. As more fully set forth in Findings of Fact 37 *et seq.*, this system changed in the 1973–1974 budget year, when local plans and budgets ceased being the determinants of the size of state appropriations.

The District's 1975–1976 plan called for dramatic expansion of LD programming. The goal was to serve 2,816 LD's. The plan was approved for instructional content, but the budget request for state reimbursement was cut sharply. The cut was not based on non-compliance with § 13–1373. Rather, the District budget felt the impact of a standardized, statewide budget cut based on a formula instituted by the Superintendent. (There is no evidence in the record that the Legislature directed that this procedure be instituted.)

The District did not substitute local funds for the withdrawal of expected state support, and therefore did not implement the plan.[22] Hence, it was not operating special education services "in accordance with an approved plan." It did not draw up a revised plan which would have comported with financial realities.

*Appropriate Education: Standard of Review*

■ The District violated the special education statutes by failing to identify LD's, and by failing to conduct LD instructional programming in accordance with a state-approved plan. The Superintendent of Public Instruction failed to enforce the statutes and regulations against the District. To reach these conclusions, it was not necessary to resolve any difficult educational policy issues. The plaintiffs' rights were clearly defined by the statutes and regulations. We now consider the defendants' contention that all LD's in the District are receiving appropriate instruction. If true, this fact would not defeat the determinations of liability, but would affect the consequences of these findings for relief. Before assessing the evidence, however, it is necessary to define the appropriate standard of review.

What kinds of special educational services are appropriate for the needs of learning disabled students? In the findings of fact, we noted areas of agreement and disagreement among professional educators. Pennsylvania statutes and regulations substantially resolve the disagreements which are material to this case, making it unnecessary for the court to involve itself significantly in those policy questions. The identification issue is an important example. The District contends that all LD's do *not* have to be identified in order to provide them with appropriate education; unidentified LD's who need special instruction are placed in basic education remedial programs from which they benefit. The plaintiffs strongly dispute these assertions. For our purposes, however, the controversy is moot because the Legislature has already determined that all LD's must be identified.[23]

---

22. Actually, the plan consisted of a primary plan and two alternative plans. None of the three plans has been implemented. Findings of Fact 33–36.

23. This screening requirement probably is based on the theory that if a child's exceptionality has not been identified, then there is a significant chance that the educational services available to him are inappropriate.

Pennsylvania law does not describe the content of special education services, e. g. number and size of classes, curriculum, psychological services. Instead, it establishes specific procedures in accordance with which local and state educational experts will—through various interactions with one another—define standards, assess needs, and implement programs. The products of this decision-making process give content to the phrase, "proper education and training." In this case, school officials have not abided by the mandatory decision-making procedures. Consequently, the District is not providing special education services in accordance with a state-approved plan. The defendants contend, however, that District programs provide appropriate education for LD's, and, therefore, the primary purpose of the special education laws is satisfied. It is difficult to evaluate this claim. In the statutory scheme, "proper education and training" does not have a permanent meaning that is independent of the decision-making procedures in accordance with which the standard is supposed to be implemented. On the other hand, the Commonwealth has promulgated a carefully thought out set of regulations pursuant to the statutes. We think the defendants are entitled to an opportunity to prove that—notwithstanding the violation of statutory procedures—the main, substantive legislative goal (as elaborated in the State Board Special Education Regulations) has been met. By proving that point the defendants would limit the scope of their violations and relief would be shaped accordingly. Although a precise interlocking of right and remedy is rarely possible in public law class action suits,[24] the main dimensions of relief should correspond to the characteristics of the violation.[25]

Allowing this form of proof returns us to the problem of defining the standards for judicial review. We are not dealing with a statute that merely declares a right to appropriate education and leaves it to education agencies to create their own decision-making procedures for implementing the right. If special education services were challenged under such a law, a court would have to defer substantially to administrative determinations that were based on relevant facts and on expert opinion. In this case, however, the defendants' deviation from legally mandated policy-making procedures makes their policy suspect.

The defendants' evidence, pleadings, briefs, and argument in this case cannot be deemed an official, state-approved District plan. *Retrospective* planning (i. e., developing explanations for past policy in answer to a lawsuit) is a closed-ended process. There is a strong incentive to mold discretionary professional findings so that they lead to self-serving conclusions. *Prospective* planning is more open-ended. Problems are more likely to be assessed objectively, and there is no great penalty for admitting mistakes, because there is time to correct them. For the same reasons, we cannot give the retrospective indorsement of the District plan the same weight as we

**24.** *See generally* A. Chayes, "The Role of the Judiciary in a Public Law System," 89 Harv.L. Rev. 1281 (1976).

**25.** *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); *Milliken v. Bradley,* 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974); *Hills v. Gautreaux,* 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976). Applying this general rule requires close attention to the facts of the particular case, for example, the temporal and geographical scope of unlawful activity, and the causal connections between the violations, and the detriments suffered by the class. *Compare Rizzo, supra*; and *Milliken, supra*; with *Hills, supra*; and *Evans v. Buchanan,* 416 F.Supp. 328 (D.Del.1976).

In order to provide effective relief, it may be necessary for a court to adopt standards which were not authoritative in the liability phase of the case. For example, on the face of it, the broad mandate of the Equal Protection Clause does not relate to the needs of educational treatment. (*But see Serna v. Portales Municipal Schools,* 351 F.Supp. 1259 (D.N.M.1972).) But when a court is faced with a case of unequal treatment, it may order the defendant to provide services which are appropriate for the plaintiff's individualized educational needs. *Mills v. Board of Education,* 348 F.Supp. 866 (D.D.C.1972). *PARC v. Commonwealth of Pennsylvania,* 334 F.Supp. 1257 (E.D.Pa.1971), 343 F.Supp. 279 (E.D.Pa.1972).

would have given a timely approval of the plan through normal procedures.

■ To preserve the integrity of the statutory scheme—particularly its provisions for formal planning, for accountability in decision-making, and for delegation to professional staffs of standard-setting responsibilities (under circumstances that do not have potential for distorting professional judgment)—it is necessary to apply a relatively strict standard in reviewing defendants' actions. First, are the stated objectives of District policies regarding LD services legitimate objectives? Second, is there a fair and substantial relationship between the objectives and the means employed? Third, if expert evidence is relied upon to rationalize an objective or a means, is there a fair and substantial relationship between that objective or means, and a respectable body of expert opinion?

### Appropriate Education: Applying the Standard

The defendants' position is based on five propositions:

1) The District has not identified all LD's.

2) Some LD's must have services designated special education.

3) The District has identified and placed in special education programs all LD's whose handicaps require instruction designated special education.

4) Other, unidentified, LD's can receive appropriate instruction in basic education and in general remedial education programs.

5) All unidentified LD's are receiving appropriate instruction in other programs.

The first and second propositions are undisputed. The District has not identified all LD's. Some LD's need special education services.

■ As for the third proposition, the record does not show that all LD's needing special education instruction are in special education programs. How would they be assigned to these programs? The defend-

ants claim that its teacher referral procedures (together with the parent-initiated due process hearings) are adequate to identify all LD's with a handicap serious enough to require special education services. However, their witness, Dr. Hammill, did not attempt to refute the testimony of Drs. Bartel and Brutton, who said that teacher referrals, as practiced in Philadelphia, passed over many LD's with serious handicaps (particularly well-behaved LD's). The other major flaw in this proposition is that the number of available placements in special education programs falls significantly short of the projected number of LD's who need those programs. Dr. Hammill estimated that there would be 2,000 severe and moderate LD's in the District's secondary schools, about half of whom would need self-contained classrooms. (The plaintiffs' experts considered this figure to be a conservative estimate.) As seen in Table I, *supra,* there are no self-contained public school classrooms for the approximately 1000 secondary students needing them. There are no part-time special education placements for the others. (About 700 adolescents are in private school placements.)

Fourth, it is true that some LD's can benefit from the remedial techniques used in basic education programs, but the evidence in the record does not show that general education programs can be relied on to provide appropriate instruction for the large numbers of unidentified LD's in the District. An example can illustrate this point. Students A and B are moderate LD's with identical handicaps. A's teacher refers A to a psychologist. He is identified as an LD, and evaluated by an LD specialist. The specialist assigns him to a resource room for an hour a day, and prescribes a course of remedial reading exercises that are borrowed from a remedial reading course. B's teacher notes that B is underachieving, and places him in Benchmark. Without recognizing that B is an LD, the Benchmark teacher assigns B the same exercises that A is working on in the resource room. If A is getting appropriate education, so is B.

With what frequency can we expect unidentified LD's (the "B" students) to receive substantially the same instruction as identified LD's (the "A" students)? The statutory requirement that all exceptional children be identified is a factual determination by the Legislature that non-special education programs cannot be relied upon to furnish appropriate education to *unidentified* LD's. The record in this case does not contradict that determination. In many cases "B" students will not be referred to remedial programs.[26] Or they will be placed in remedial programs and given inappropriate instruction. For example, if A and B do not show much improvement after using the remedial reading materials for a period of time, the special education instructor will be better able to understand the reason for the failure and to prescribe another course of instruction, perhaps one not used in general remedial classes. The Benchmark teacher, on the other hand, may not have a theory to explain the problem and may simply give B more of the same materials.

That some of the same techniques are applied in LD classes and in general remedial programs does not establish that remedial programs are a reliable instrument for providing appropriate education to unidentified LD's.[27] This is not to say, however, that all identified LD's must be placed in special education classes. "Mainstreaming"[28] is a preferred technique under the Regulations. But leaving it to chance that unidentified LD's will find their way into appropriate programs is not mainstreaming. In certain circumstances LD's will receive appropriate instructional services in non-special education classes (proposition No. 4), but the District has failed to show that this is, in fact, the case with unidentified LD's (proposition No. 5).

It may be that our analysis suffers from a failure to distinguish between minimally appropriate education, and very appropriate education. We have found that although some LD's can *benefit* from general remedial programs, it appears that such programs are not providing the District's unidentified LD's with what the statutes and regulations refer to as "appropriate education." It can be argued that the District has satisfied the statutory mandate with its existing configuration of services, and our analysis only demonstrates that *if* the District identified all LD's and provided them with special education services (or mainstreamed them at the direction of learning disabilities specialists) then it would be providing *better* than the minimum level of appropriate instruction. It is hard to reconcile this argument with the District's 1975–1976 Needs Budget, and with the Moody Memorandum, in which a high ranking Pennsylvania education official stated that the State Regulations were not being enforced for LD's. Before making sharp budget cuts, the Department encouraged the District to submit a plan that forthrightly stated what was really needed for LD's. The District acted in good faith to design and submit such a proposal. The terms of the Needs Budget does not estop the defendants from making a responsible professional judgment that a lesser plan can satisfy the minimal level of appropriate educational services. The plan is an important reference point, however, for evaluating whether the position taken by the defendants in this case does, in fact, represent a responsible professional judgment about what constitutes appropriate educational services for LD's. The extremely large discrepancy between the 1975–1976 Needs Budget and the actual level of services in 1975–1976 is irreconcilable. After considering the five components of

---

**26.** Approximately 104,800 children in the District are classified as "underachievers," and are eligible for the programs described in Table II. (Title I is, in addition, limited to pupils from poor families.) Thus, from a statistical point of view, there is no great likelihood that many unidentified LD's will be in the Checkpoint, Benchmark, AID, or Alternative Programs. On

the other hand, it is possible that many receive Title I services.

**27.** Dr. Hammill testified that traditional remedial reading techniques often are inappropriate for LD's.

**28.** See supra, at 973–974.

defendants' argument, we find that there is not a fair and substantial relationship between present District services (the existing means for providing appropriate education) and a respectable body of relevant expert opinion.

### CONCLUSION

The District has violated the Pennsylvania special education statutes and regulations by failing to identify all learning disabled students, and by failing to implement a state-approved plan for appropriate education of the learning disabled. The Superintendent of Public Instruction has failed to carry out his duty to enforce this statutory scheme. Significant numbers of learning disabled students in the School District of Philadelphia are not receiving appropriate instruction.

In the class action aspect of this case, plaintiffs are entitled to relief under the Pennsylvania special education statutes and regulations. Further proceedings will be held to determine an appropriate remedial order.