Patricia ARMSTRONG et al.

v.

Caryl KLINE et al.

Patricia Sue BATTLE et al.

v.

COMMONWEALTH OF PENNSYLVA-
NIA et al.

Natalie BERNARD et al.

v.

COMMONWEALTH OF PENNSYLVA-
NIA et al.

Civ. A. Nos. 78–172, 78–132 and 78–133.

United States District Court,
E. D. Pennsylvania.

June 21, 1979.

Janet F. Stotland, Education Law Center, Philadelphia, Pa., Sylvia Meek, Philadelphia, Pa., for plaintiff.

Robert Lear, Legal Dept., School Dist. of Philadelphia, Philadelphia, Pa., Allen C. Warshaw, Pa. Dept. of Justice, Harrisburg, Pa., William Lincke, Media, Pa., Vram Nedurian, Newtown Square, Pa., Elinore O'N Kolodner, Robert A. MacDonnell, Obermayer, Rebmann, Maxwell & Hippel, Philadelphia, Pa., for defendant.

Michael L. Levin, Cleckner & Fearen, Harrisburg, Pa., amicus curiae.

Leonard Rieser, U. S. Dept. of Justice, Washington, D.C., amicus curiae.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

NEWCOMER, District Judge.

### CONTENTS

I. Introduction    585

II. Factual Findings    585

   A. Parties    585

   B. Defendants' Procedures, Practices and Policies    586

   C. Plaintiffs' Attempt to Challenge the 180 Day Rule Prior to Instituting Suit    587

   D. Characteristics of the Class and of Named Plaintiffs Relevant to Their Educational Needs    588

     1. The Severely and Profoundly Impaired by Mental Retardation    588

     2. The Severely Emotionally Disturbed    589

   E. The Educational Process with Respect to SPI and SED Children    590

     1. The Educators' Goals for SPI and SED Children    590

     2. The Educational Program    591

     3. Teaching Methods    591

     4. Factors Affecting Learning    592

F.  The Effects of Breaks in Programming    592
    1.  Regression    593
        (a) SPI Children    593
        (b) SED Children    596
    2.  The Time Required to Recover from Regression Caused by Breaks in Programming    596
    3.  The Effect of Programming Breaks on the Educational Development of SPI and SED Children    597

III. The Law and Its Conclusions    600
    A.  Plaintiffs' Claim Under the Education for All Handicapped Children Act of 1975    601
        1.  Exhaustion    601
        2.  The Education for All Handicapped Children Act and the 180 Day Rule    602

## I.  INTRODUCTION

In January 1978, five handicapped children and their parents commenced three class action lawsuits. Plaintiffs allege that defendants violated and continue to violate plaintiff children's constitutional and statutory rights by denying them a free publicly funded education in excess of 180 days, the provision of which they seek to compel in these suits. Since the actions began, one plaintiff, Patricia Battle, has turned twenty-one and, therefore, no longer seeks nor is eligible for future educational placement; however, she, as well as plaintiff Natalie Bernard, seeks damages for defendants' alleged deprivation of her rights.

The trial of this matter demonstrates the important and difficult role the judiciary must play in the expanding field of educational law. In the 1970's, through judicial action [1] and federal legislation,[2] the rights of handicapped children have been enlarged and guaranteed and they and their parents have been given the power to enforce those rights in several forums, including federal court.[3] But when they come to court, as they do here, they ask it to rule on issues of law and to resolve factual debates between educators in a field with which the courts, to this point, have had little familiarity. Thus, besides determining questions of statutory interpretation of first impression, the Court here is called on to decide what effect interruptions in programming have on handicapped children, an issue on which educators disagree. Rendering these determinations are difficult, but they are crucial if the rights of handicapped children are to be protected.

For purposes of trial on their common injunctive and declaratory issues, the three lawsuits were consolidated, and trial on those issues was held in March 1979.

## II.  FACTUAL FINDINGS

### A.  Parties

The named plaintiff children are: John Garrett (Gary) Armstrong, Richard H., Mark Anderson, Patricia Sue Battle and Natalie Bernard. The children's parents are also named as plaintiffs.

Plaintiff Gary Armstrong is eight years old and is classified for educational purposes as severely and profoundly impaired. He resides with his parents, plaintiffs John and Patricia Armstrong, in the Philadelphia School District. Presently, Gary attends a public Philadelphia School District facility as a day student, in a class for the severely and profoundly impaired.

At eighteen years old, plaintiff Richard H.'s primary handicap is a severe emotional

---

1. See, e. g., Frederick L. v. Thomas, 419 F.Supp. 960 (E.D.Pa.1976) aff'd, 557 F.2d 373 (3 Cir. 1977); Fialkowski v. Shapp, 405 F.Supp. 946 (E.D.Pa.1975); Mills v. Board of Education of the District of Columbia, 348 F.Supp. 866 (D.D.C.1972); Pennsylvania Association for Retarded Children (PARC) v. Commonwealth of Pennsylvania, 334 F.Supp. 1257 (E.D.Pa. 1971).

2. See, e. g., Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; Education for All Handicapped Children Act, 20 U.S.C. § 1401, et seq.

3. Recent commentary discussing the developing role of the federal courts in the area of the education of the handicapped include: Note, Enforcing the Right to an "Appropriate" Education: The Education for All Handicapped Children Act of 1975, 92 Harv.L.Rev. 1103 (1979); Haggerty & Sacks, Education of the Handicapped: Towards a Definition of an Appropriate Education, 50 Temp.L.Q. 961 (1977); Note, The Education of All Handicapped Children Act of 1975, 10 U.Mich.J.L.Ref. 110 (1976).

disturbance. Attending Elwyn Institute, Richard is in a five-day a week, 180 day residential program. He and his mother, plaintiff Norma H., are residents of the Philadelphia School District.

Plaintiff Mark Anderson also is handicapped by a severe emotional disturbance. Mark, who is nineteen, is a twelve month residential student at the Devereux Foundation. Plaintiff Eloise Anderson, Mark's mother, resides in the Philadelphia School District.

When suit was instituted, plaintiff Patricia Sue Battle was twenty years old, attending as a residential student, The Woods Schools. She is severely emotionally disturbed and brain injured, and her parents, June and Donald Battle, reside in the Abington School District.

Plaintiff Natalie Bernard is seventeen years old. Severely mentally retarded, as well as orthopedically handicapped, she is a residential student at Elwyn Institute. With her parents, plaintiffs Clara and Robert A. Bernard, she resides within the Marple Newtown School District.

By Order dated February 21, 1979, the action captioned *Armstrong v. Kline*, Civil Action No. 78–172, was certified as a class action pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure on behalf of a class composed of:

> "All handicapped school aged persons in the Commonwealth of Pennsylvania who require or who may require a program of special education and related services in excess of 180 days per year and the parents or guardians of such persons."

As the other two related cases were consolidated with the *Armstrong* action, no additional certifications were required and the consolidated actions are now proceeding on behalf of the above-described class.

In all three actions, plaintiffs instituted suit against the then Secretary of Education, Caryl M. Kline, in her official capacity. In addition, Gary Armstrong, Richard H., Mark Anderson and their parents sued the School District of Philadelphia, the Superintendent of the School District, Michael Mar-

case, and members of the Philadelphia Board of Education. Besides the Secretary of Education, Patricia Sue Battle brought her action against the Abington School District, Dr. Carl B. Hoffman who is the Superintendent of the Abington School District, The Woods Schools and Dr. Harold S. Barbour, President of The Woods Schools. Similarly, Natalie Bernard also named the following individuals and entities as defendants: the Marple Newtown School District; Glenn M. Sanner, Superintendent of the Marple Newtown School District; Elwyn Institute; and, Dr. Gerald R. Clark, President of Elwyn Institute.

Defendant school districts and the Department of Education (DOE), of which defendant Kline was the chief official, are recipients of federal financial assistance, including, but not limited to, funds received under the Education for All Handicapped Children's Act. As the state educational agency, the DOE is responsible for insuring that free and appropriate special educational services are provided to all handicapped school-aged persons in Pennsylvania. Defendant Philadelphia, Abington and Marple Newtown School Districts are local educational agencies, and defendant The Woods Schools and Elwyn Institute are approved private schools that may provide services to handicapped children and be eligible for reimbursement from public funds for the provision of those services.

B. *Defendants' Procedures, Practices and Policies*

The Department of Education, which has paramount responsibility within the Commonwealth for the design and financing of publicly funded education for handicapped and non-handicapped children, requires local school districts and their agencies to develop annually an individualized education program (IEP) for each handicapped child. The IEP maps out the child's educational program and placement, detailing the degree to which the child will be in special and regular settings, his or her current functioning level, short- and long-term educational goals, and the methods by which

they are to be achieved. Before the IEP is formulated, the child is evaluated by educational and medical personnel appropriate to that child's handicap. A multidisciplinary team composed of persons familiar with the child then reviews these evaluations and all other relevant data and determines the type of educational program that it believes appropriate in light of the nature and severity of the child's handicapping condition. The child's parents or guardians review the IEP with the educators and are permitted to comment on it.

If parents disagree with the school district or the DOE about any aspect of their child's educational program, placement or classification, a "due process procedure" may be initiated by any of the parties. A hearing examiner, who is not employed by the school or intermediate unit in which the case originates, will be appointed by the DOE and he or she will conduct a hearing.

It is the policy and practice of DOE to refuse to provide or to fund the provision of education for any child, handicapped or non-handicapped, for a period in excess of 180 calendar days per year. It has instructed hearing officers conducting due process hearings that they are without authority to, and may not, order a special education program which is in excess of 180 days per year. Similarly, defendants Philadelphia, Abington and Marple Newtown School Districts will not provide or fund the provision of education for any of the children within their respective districts for a period in excess of 180 days.

C. *Plaintiffs' Attempt to Challenge the 180 Day Rule Prior to Instituting Suit*

In February, 1977, the Philadelphia School District placed plaintiff Gary Armstrong in the Torresdale School, which operates its educational program for approximately nine and one-half months per year. Following his placement at Torresdale, Gary's parents requested a special education due process hearing concerning both his program and placement. At the hearing held in March 1977, the issue of Gary's need for a continuous educational program in excess of 180 days was raised. Although she did not explicitly order the Philadelphia School District to provide Gary with a program of summer education, the hearing examiner decided that "as much programming as possible should be done to prevent regression." (P–5 at p. 25). "Expert opinion supported by professionals and parents . . . that a 12 month program for Gary was important to prevent regression during the summer months especially since degenerative processes are a characteristic of his syndrome," provided the basis for her decision. (*Id.* at p. 28) Believing that the hearing examiner had awarded Gary summer programming, his parents met with the Assistant Director of Special Education of the Philadelphia School District in May 1977. Nevertheless, he informed them that the School District would not fund a program of summer education for Gary, regardless of his needs, as it was not empowered to do so by the DOE. The meeting's participants drafted a letter to the Special Education Assistant for the DOE asking for confirmation of its position; in her reply, the Special Education Assistant confirmed what the School District believed, which was that a program of public or publicly funded special education was not available for the summer.

Although the mothers of Richard H. and Mark Anderson protested the DOE's and the Philadelphia School District's failure to provide their children with year-round programming, neither requested a due process hearing on the issue; nevertheless, their counsel was informed that regardless of the circumstances, neither the DOE nor the School District would provide or fund an educational program for the boys in excess of 180 days.

The parents of Natalie Bernard and Patricia Battle did not challenge defendants' application of the 180 day rule to their children's educational program.

If plaintiffs had tried to challenge defendants' 180 day rule through the Commonwealth's due process procedures, their efforts would have been futile because of defendants' instructions to hearing examin-

ers that such a program would not be available and that the hearing examiners were without authority to order it.

Turning to the federal authorities, counsel for Armstrong, H., and Anderson plaintiffs wrote to the federal Office for Civil Rights of the Department of Health, Education and Welfare requesting an interpretive ruling on whether federal statutory law, i. e., the Education for All Handicapped Children Act and/or Section 504 of the Rehabilitation Act, can ever require defendants to provide a program of continuous education to a handicapped child. Prior to trial, the agency did not respond.

On January 25, 1979, counsel for the Armstrong, H. and Anderson plaintiffs contacted the federal Bureau of Education for the Handicapped and requested a similar ruling from that agency. Again, no response was received before trial.

D. *Characteristics of the Class and of Named Plaintiffs Relevant To Their Educational Needs*

The children that plaintiffs allege are members of the class, as defined above, suffer from various handicapping conditions, but generally can be classified in two separate, occasionally overlapping, categories: severely and profoundly impaired by mental retardation with other handicaps; and severely emotionally disturbed.

1. *The Severely and Profoundly Impaired by Mental Retardation*

Although it is often difficult to categorize the degree of mental retardation from which an individual suffers, there are certain recognized labels for levels of mental retardation, which professionals employ to help discuss both the characteristics of an individual's handicap and his or her needs. These levels are:

(a) Mildly retarded. The mildly retarded have an I.Q. range from 50 to 75. At the completion of their formal education, it is likely that these individuals will be able to read at the second or third grade level, do simple mathematics, and function in society. They do not look different from non-handicapped persons and often are unidentifiable once formal education has been terminated. They are likely to assume unskilled or semiskilled positions in the workforce.

(b) Moderately retarded. With an I.Q. range from 30 to 50 and frequently suffering from physical impairments, the moderately retarded are more likely than the mildly retarded to look "different." Moderately retarded children can be expected to learn simple arithmetic, have a sight vocabulary and perform simple reading skills.

(c) Severely retarded. The severely retarded have an I.Q. below 30, are likely to be physically handicapped and have difficulty moving. They may enter the school system without toilet training and lack many basic self-help skills, such as dressing and feeding. Their language deficit is usually significant. Academically, one expects their achievements to be very limited, although they may be able to count, tell time and identify a few words on sight at the completion of their education.

(d) The profoundly retarded. Being the lowest functioning group, the profoundly retarded are unlikely to be ambulatory or have any vocabulary. A profoundly retarded child's means of communication are minimal, perhaps limited to pointing or gesturing.

As the severity of retardation increases, so does the likelihood that the child will have multiple handicaps; in fact, very few children who are severely or profoundly retarded do not have other impairments. For this reason, children who are severely or profoundly retarded are often referred to as "severely and profoundly impaired" (SPI).

SPI children usually learn at a much slower rate than non-handicapped children and have difficulty remembering what they learn. The lower functioning the child is, the quicker he or she will forget information and lose skills that are not practiced. Generalizing the skills that are learned also presents problems for SPI children; they often do not recognize that they should use learned skills in an environment different than the one in which they were originally taught.

Natalie Bernard is an SPI child, suffering from Down's Syndrome. Although she has made some progress in reading and music, she is severely retarded in terms of her intellectual and social abilities. Obstinate in her ways, she requires constant supervision. Complicating her handicap, Natalie has developed double scoliosis, that is two sideway curvatures of the spine; because of this condition, she must wear a brace twenty-three hours a day.

Gary Armstrong is also labeled as an SPI child but, unlike many other SPI children, he was not mentally retarded at birth. He exhibited all the signs of a normal child until he was nearly two years old. After that, his rate of learning decreased, he became hyperactive and his parents could not toilet train him. Recognizing that Gary had a problem, his parents took him to doctors who diagnosed his condition as San Filippo, Type A Syndrome, a genetic disease. Persons suffering from San Filippo disease lack an enzyme essential to the metabolization of mucopolysaccharides. Without the enzyme to break them down, the mucopolysaccharides accumulate in the connective tissue of the body and cause progressive physical and mental deterioration. The symptoms of the disease, which begin to appear between one and one-half and three years of age, include coarsening of the features, progressive mental retardation, joint contractures, hyperactivity and seizures. Almost all San Filippo children begin to act in a violent and aggressive manner as the disease progresses. Their mobility decreases and they are confined to a wheelchair during the latter part of life. Persons with the disease have a life expectancy of less than twenty years. Because of their immobility and progressively worsening physical, emotional and mental states, which do not allow their parents to control them, they are usually institutionalized during the last stage of the illness. Death generally results from a secondary infection, such as pneumonia, which is easier to contract when institutionalized and immobile. The disease knows of no cure.

San Filippo Syndrome severely affects intellectual development so that by the time they reach school age, children with this disease are in the severe to profound range of mental retardation, with limited receptive and expressive language skills. As the mucopolysaccharides build up and the disease progresses, the San Filippo child becomes more retarded, losing previously acquired skills.

Gary Armstrong is presently severely to profoundly mentally retarded, hyperactive, physically disabled by progressive joint contractures, somewhat deaf and frequently the victim of psychomotor seizures.

2. *The Severely Emotionally Disturbed*

As with SPI children, it is often difficult to distinguish and identify the specific handicap from which a severely emotionally disturbed (SED) child suffers. Classifications utilized by professionals in the field frequently blend one with another. But, to aid in understanding the types of disabilities which these children endure and the characteristics of these disabilities, it is useful to employ the following categories in analyzing the problems of that class of children generally characterized as severely emotionally disturbed:

(a) Autistic children. An autistic child functions without emotional contact with other human beings and does not communicate with speech. Such a child insists on maintaining the sameness of his or her environment and is upset by changes. Demonstrating a number of bizarre behaviors and movements, the child may spin or rock. These behaviors commence within the first year and one-half of life, and the child will show evidences of higher level intelligence than these behaviors otherwise indicate.

(b) Symbiotic children. Symbiotic children become extremely attached to and cannot be separated from one person. Like autistic children, they demand sameness in their environment and exhibit a high degree of anxiety and bizarre behavior if routines are interrupted.

(c) Schizophrenic children. These children may enter relationships with others and communicate orally, but the nature of

590

their communications and relationships are strange and bizarre, exhibiting their inability to cope with reality and articulate it in their communications. For example, a schizophrenic child may be bleeding but, rather than cry or call for help, he or she will laugh. These children express extreme anxiety at the slightest change in routine, or in the presence of pressure or frustration. Tantrums are common to their behavior.

There are other types of children who function at a higher level than those described above, but who are still considered seriously emotionally disturbed. They would include post-symbiotic, post-autistic and higher functioning schizophrenic children whose disturbances seriously interfere with learning and their ability to function.

SED children are unable to tolerate frustration and other pressures such as those imposed by focusing attention and waiting. Because of this and their inability to exercise self-control, they experience extreme difficulty learning. Once having learned a skill, like SPI children, they have problems generalizing that skill.

Richard H. originally was considered as autistic child when, at eighteen months, he stopped talking and shut himself off from the world. Now eighteen, he is currently diagnosed as a childhood schizophrenic, chronic type, manifesting severe ego disturbance, infantile regressive behavior with pervasive anxiety and signs of minimal brain dysfunction. Although able to better control himself today than just a few years ago, Richard is still anxiety ridden and may engage in compulsive and ritualistic activities. He remains hyperactive and has occasional temper tantrums; he also has a foot and cleanliness fetish.

Mark Anderson is another SED child. He had a nervous breakdown at thirteen and suffers today from severe emotional disturbance, characterized by temper tantrums, enuresis, self abuse, hyperactivity, ritualistic behaviors and verbal and motor stuttering. Under the stress of pressure or demands, Mark may become more aggressive and exhibit additional ritualistic behaviors.

His attention span is short and he can be distracted easily.

Patricia Sue Battle's parents first suspected her handicap when at eighteen months she did not respond to noise. After the doctors recognized that she did not have a hearing problem, they diagnosed her problems as stemming from an emotional disturbance which eventually was labeled as autism. Her emotional problems are compounded by mild to moderate retardation.

E. *The Educational Process with Respect to SPI and SED Children*

1. *The Educators' Goals for SPI and SED Children*

As do educators of normal children, teachers of the SPI and SED often articulate the goal of education as being the attainment of the child's highest potential. But, of course, when they discuss the potential of these types of handicapped children as compared to non-handicapped children, it is clear that there are differences both in expectation and reality. While an educator may anticipate that a normal child will become a doctor, professor, musician or magician, these are not the sights set for the SPI or SED child. Generally, educators of the SPI or SED speak of their students' potential in terms of attaining the highest level of self-sufficiency that the child can achieve, whether that be acquiring additional self-help skills, avoiding institutionalization or attaining that level of independence with regard to self care that he or she can live in a community living arrangement or at home and work in a sheltered workshop. Both plaintiffs' and defendants' experts agreed that these generally were the objectives of the education of the SPI and SED. With the exception of Gary Armstrong, these are also the types of goals that the teachers of the named plaintiffs have set for them and believe them capable of achieving with proper educational programming.

Of course, some SED or SPI children will surpass these levels of achievement. Others will not reach them and for them, the

goals may be more modest, but equally important to reach. For instance, a child suffering from San Filippo Syndrome, such as Gary Armstrong, will probably not live long enough or be able to become sufficiently independent to reside in a community living arrangement or work in a sheltered environment. For this type of child the educator's goal is to provide skills that keep the child mobile and at home for as long as possible, for these two factors contribute to increasing life expectancy. Out of the institution and out of bed, the child's chances for contracting such secondary diseases as pneumonia are reduced.

### 2. The Education Program

Given the disparity in goals, it is not surprising that the educational program for SPI and SED children is very different from that of normal students. Although mathematics and reading may, in some instances, be part of these children's curriculum, they are not the staples of it.

It is not unusual for the SPI child to enter the school system without such basic skills as toilet training, self-dressing, and self-feeding. If this is the case, that is where the educator begins; the educational program will be designed to teach these skills. As the child progresses and masters these fundamentals, the educational program will be supplemented, providing for the teaching of more complicated tasks, such as counting, making change and identification of simple words.

Natalie Bernard's program at Elwyn Institute, for instance, is one of functional academics, focused on developing basic language, arithmetic and living skills, including those of hygiene, dressing, and preworkshop. They are taught for the purpose of enabling her to live and work outside the institutional setting and in a group home and sheltered workshop.

Because of Gary Armstrong's limited abilities which constantly degenerate and the goal of keeping him mobile and out of the institution, the skills that he is taught at the Torresdale School are even more basic than those that Natalie Bernard learns. One of the major areas of concern

with regard to his programming is teaching him skills that allow him to be managed and controlled by his parents, because once he becomes uncontrollable, institutionalization is almost unavoidable. Although aggression and violent behaviors characterize San Filippo syndrome, experts believe that there is a direct correlation between reduced levels of these unacceptable behaviors and participation in educational programs teaching self-control skills. Consequently, Gary is taught such skills as sitting down upon being told to do so, keeping his hands down, dressing, coming when called, feeding and toilet training. Because Gary is losing his hearing, his teacher also is teaching him some sign language to enable him to communicate and be communicated with when he becomes completely deaf.

SED children, like SPI children, may lack basic life skills. But frequently, before the educator can begin to teach these skills, the child must be helped to cope with the emotional disturbance that is the source of the problem. Therefore, it is not uncommon for the SED child's curriculum to include psychotherapy or other programs designed to develop relationships with others, decrease inappropriate behaviors and increase appropriate behaviors.

At Elwyn Institute, Richard H.'s educational program is constructed to provide him with functional skills, as well as to aid him in his social development, which the experts recognize as a prerequisite to his learning. Similarly, Mark Anderson's educational program integrates programs designed to furnish him with functional skills and those that will enable him to deal with his emotional problems. He is given individual psychotherapy at Devereux. When she was attending The Woods Schools, Patricia Battle was also given psychotherapy as well as an educational program stressing development of life skills.

### 3. Teaching Methods

Although the specific method for teaching SPI children may vary from teacher to teacher and from child to child, SPI teachers usually employ the "diagnostic-prescrip-

tive" model as a basic teaching guide. The model, which is endorsed in the DOE's curriculum guide for retarded children, first instructs the teacher to determine the child's level of functioning and needs. Based upon that assessment, appropriate long- and short-term goals should be set, as well as criteria for determining when the goals are attained. The educator may teach the child the goal in small discreet steps that build one on another and must be achieved to reach the goal. The small steps are taught by way of practice sessions or "trials" until they are learned. To evaluate the child's progress in learning the small steps and reaching the goal, the teacher may employ the data-based teaching method, which requires that the child's responses to each trial be recorded and then reviewed. If the child fails to progress as anticipated, the plan is modified. When a child achieves the criteria for learning a goal, he or she should continue to practice it so that the child will learn to generalize it and perform it naturally in a variety of environments and for a variety of people. The more related the goals and small steps are to the child's routine outside the classroom, the easier it will be for the child to generalize what has been taught. When the behavior has been generalized, it is considered mastered.

The diagnostic prescriptive model also is useful to teach SED children functional skills and to modify their behaviors. In addition, SED teachers employ psychotherapy and other psychological techniques aimed at establishing inter-personal communication. These techniques may include exercises aimed at relaxing the child and securing his or her trust in others. To reach these ends, psychologists or other educational personnel may allow the child to dance, take walks, roll down hills or otherwise vent frustration.

### 4. *Factors Affecting Learning*

To understand the handicapped child's educational process, it is necessary to recognize those factors in the educational environment that affect the child's learning ability. From the expert testimony, the Court concludes that several factors have an impact on whether and at what rate a child learns. Surely, one of the most important and an immutable one is the nature and characteristics of the child's handicap. In many ways, this factor defines the boundaries for learning. But other factors operate to affect the handicapped child's educational experience and can have a significant impact on it. Teacher competency is certainly one of them. So, too, is the functionality of the skill being taught; if the skill is one that can be performed outside the classroom, the chances that it will be learned and learned at a quicker rate than otherwise possible increase. Along these lines, the opportunity to practice outside the formal classroom is a significant factor. And finally, to some unknown extent, the length of time that a child has to practice a skill increases the likelihood that the skill will be mastered. If the child only has a short time to learn the skill, it might not be learned, but if the length of time to learn the skill is increased, so are the chances of learning, although it is by no means certain that the skill ever will be mastered.

### F. *The Effects of Breaks in Programming*

The 180 day rule deprives the handicapped child of educational programming for more time than he or she receives it. Plaintiffs' contend that certain handicapped children, including named plaintiffs, are denied an appropriate education because of these breaks in programming. They claim that, during the breaks, these children regress to such an extent that the time required to regain lost skills and development once programming resumes is so great that it renders impossible progress and the learning required for reaching their otherwise obtainable goals in the area of self-sufficiency. Defendants deny that regression is an effect of programming interruptions and contend that any skill loss occurring during a break can be quickly recouped, without major impact on the child's progress.

## 1. *Regression*

■ The expert witnesses agree that it is the general opinion of educators and other professionals who work with SPI and SED children that substantial interruptions in educational programming cause some of these children to suffer a significant loss of skills because of the breaks. Nonetheless, the experts recognize that there is no known statistical study supporting or contradicting this opinion. They also acknowledge that non-handicapped children may experience a loss of skills during breaks of similar duration. The difference in opinion between plaintiffs' and defendants' experts lies in plaintiffs' experts subscription to the general opinion regarding handicapped children and the defendants' experts rejection of it.

### a. *SPI Children*

From the experts' testimony concerning the class and named plaintiffs, the Court concludes that as a result of programming interruptions some SPI children lose a large amount of skills and development, even when their parents make reasonable efforts to help them maintain the progress made in school. Furthermore, the evidence is clear that this regression is caused, at least in part, by the absence of programming during the break.

The unanimous opinion of plaintiffs' experts was that some, but not all, SPI children lose a significant amount of previously acquired skills when their programs are interrupted. Associate Professor and Chairperson of the Department of Special Education at Temple University with a Ph.D. in Special Education, Dr. Terrence J. Piper has taught the mentally retarded and their teachers as well as having developed curriculum guides for them. Having witnessed and evaluated SPI children in less than twelve month programs, he testified that a large number of them experience significant regression during breaks in programming. So too did Dr. John R. Kleiser, Director of Clinical Services at defendant The Woods Schools, and Dr. Marvin Rosen, the Assistant to the President of defendant Elwyn Institute, both of whom hold doctorate degrees in psychology from the University of Pennsylvania and have had experiences with SPI children. Christine Sadjian-Peacock, a teacher of SPI children, also testified regarding children with whom she had worked and who had lost many of their previously acquired skills during summer breaks.

The opinion of plaintiffs' experts is supported by the case history of the two named SPI plaintiffs, Gary Armstrong and Natalie Bernard, who regress when there are breaks in their programming. In the summer of 1977, Gary was not provided with an educational program. Prior to that summer, he had shown progress in most of his educational program areas, including eye contact, feeding, dressing and undressing, labelling, gross motor coordination, obeying simple commands, and verbalization. But, when he returned to school in the fall of 1977, and had the same teacher, he demonstrated a significant skill loss in most areas, including those enumerated above, even though he did show gains in a few other areas. Similarly, when Natalie Bernard comes home for weekends, she experiences regression in emotional development and functional skill level. Because she is a year round residential student at Elwyn Institute, there has been no opportunity to measure the severity of her regression over a long break. Nonetheless, Dr. John Gordon, Director of the University of Pennsylvania Neuropsychology Laboratory who has had significant experience assessing SPI disabilities opined that Natalie would experience severe regression if denied summer programming. The Court finds no reason to doubt the accuracy of his studied prediction as he has examined Natalie, spoken with her parents and has had extensive experience with children of her disability.

The evidence compels the conclusion that certain SPI children lose a significant amount of their skills during significant breaks in their programming. Although defendants do not concede this point and their expert witnesses in the SPI area claim not to have witnessed significant regression with the SPI children they have taught and observed, they do not seriously refute the

proposition that SPI children regress to some extent during breaks in programming. They strongly contend, though, that any regression that is experienced is not caused by the break itself and is merely coincidental with it. They lay the blame for loss of skills on the non-functionality of skills being taught, the lack of teacher competence and the parental failure to properly practice with the children skills that have been taught in school; they contend that the absence of a program is of no significance.

The Court cannot accept their theory. First, the correlation between breaks in educational programming and regression is significant and not merely coincidental. The evidence indicates that when SPI children, who plaintiffs' experts find regress during breaks, receive programming, they generally do not lose skills, even if they are taught what defendants' experts consider non-functional skills by what these experts deem not competent teachers and are not provided with a maintenance program by their parents. Therefore, it would appear that the absence of programming serves at least as the catalyst for regression during programming interruptions. Moreover, there are sound reasons for rejecting defendants' theory that these other factors cause the regression that plaintiffs' experts report, and not the lack of programming.

As to functionality of skills, the evidence does not demonstrate that the SPI children, who plaintiffs' experts found lost skills during breaks in programming, were not receiving an education of functional skills. Although defendant's expert in the SPI area did not believe that a few of the programs that the named plaintiffs were receiving were functional, neither that expert nor any of defendants' witnesses generally assailed the skills being taught to those SPI children that plaintiffs' experts found to experience regression. In fact, since often these students were receiving the educational program required and approved by the DOE, one would expect that it would meet the standards of functionality set by defendants' experts.

Turning to teacher competency, the next alleged cause for regression during breaks in programming, again the record is barren of evidence indicating that the children who regress are being taught by incompetent teachers. Here too, one would expect this not to be the case as they are being supplied by defendants.

The final alleged cause for regression is the failure of handicapped children's parents to maintain their children's programming. Plaintiffs' experts, as well as defendants' experts, testified extensively in this area and the Court concludes that usually parents fail to help their SPI children maintain skills over breaks in educational programming. But this failure in many cases is unavoidable even when the parents wish to aid their children and make reasonable efforts to do so. Their inability stems from not possessing the expertise needed to help their children maintain their level of skills and not having sufficient time during the day, given their other familial duties, to practice these skills with their children. Defendants' expert, Ellen Somerton Fair, who has a Masters Degree in Special Education and is Director of the Pennsylvania Training Model (an inservice training program for personnel working with SPI), did testify of her experiences with parents who have not seriously interrupted their home life and have been able to work with their SPI children and maintain their level of functional skills. Although her recollection may be accurate, the Court cannot accept her experiences as universal and generalize that all parents of SPI children will be able to, both in terms of skills and reasonable expenditures of time, maintain their children's level of skills. This would not be consistent with the experiences of plaintiffs' experts nor the conclusions drawn from them, which is that because parents lack educational training with respect to their children's handicap and face time constraints, there are some parents of SPI children who cannot maintain their children's skill level over breaks. Nor would it be in accord with the experiences of named plaintiffs Gary Armstrong and Natalie Bernard.

During the summer of 1977, when Gary was at home without an educational program, the Armstrongs were not able to help him maintain most of his previously acquired skills, even though they tried to do so, and are considered by his teacher and appear to the Court to be competent and concerned parents. Mr. Armstrong is a policemen, and his occupation, as well as his lack of training, render him incapable of working with Gary in a sufficiently able manner and for a sufficient amount of time to help Gary maintain his skills. Mrs. Armstrong has two other young children to watch, as well as Gary who needs constant supervision, and she did and still does attempt to carry on his programs in the home. Her efforts have included frequent observations of Gary in school, keeping up dialogue between herself and Gary's teachers in a "log book", and utilizing classroom teaching techniques whenever possible. Still, she was not able to maintain Gary's skills during the summer that he was without programming.

The experts who have worked with and evaluated Natalie Bernard and her family situation do not think that her parents' efforts would allow her to avoid regression during breaks in programming. Natalie requires full time attention and supervision when she is at home. Although her mother is a psychologist, the experts testified that she and her husband would be unable to maintain Natalie's skills because of their personal involvement with Natalie and the other demands that she places upon them. Except for the general testimony concerning parents' abilities to maintain their SPI children's skills in the home environment, defendants' experts did not put forth evidence indicating that Natalie's parents could maintain her skills during long breaks in programming.

Although it may be possible for some parents, whose children would otherwise regress during breaks, to work with their SPI children and maintain their skill level, this certainly cannot be expected to be the result for all parents who make reasonable efforts to aid their children. Lacking the expertise of the SPI teacher and having first to provide the normal parenting services, there are some parents, who when they try to help their children, cannot stop the regression that otherwise occurs during a break in programming. Perhaps some of these parents could be taught both the skills necessary to help their children maintain what is learned and to manage their time at home so that a sufficient amount could be devoted to the child's educational program. There was no evidence, however, that such a program was generally available to parents of SPI children.

In summary, the Court rejects defendants' theory that there are other causes of regression negating as a possibility the absence of programming as one of them. To say this, though, is not to dismiss those cases where these and other factors may contribute or even proximately cause regression. Lack of functionality of skills, teacher incompetency and parental failure to maintain their children's skills when they have both the time and ability to do so may in certain instances undoubtedly cause regression when the absence of a program, in and of itself, would not do so. But these, rather than the absence of education, have not explained why the children that plaintiffs' experts reported to have regressed during programming interruptions did so.

This regression experienced by SPI children, which is significantly greater than that known to normal children, is at least explained in part by the nature of the SPI child's disability and the manner in which it affects learning. As explained earlier, these children find it difficult to transfer skills to new environments and, therefore, often need to practice each step in a program to learn a skill and often practice it in different settings until it is mastered. And, because they have a problem remembering what they have learned, even a behavior which has been mastered must frequently be repeated or it will be lost. Breaks in programming, of course, means that the opportunity to practice skills with qualified teachers, which is crucial to both learning and retention, decreases and therefore, the chances that the child will regress increases.

Children suffering from degenerative diseases, such as Gary Armstrong's will, because of the nature of their disease lose some of their skills regardless of their practice. But they may also lose skills as a result of a programming interruption. Many of the skills that Gary Armstrong lost during the Summer of 1977 he regained after returning to school. In the 1978 summer, when he received an educational program, he did not regress. Combined, this is strong evidence that it was not the progressive deterioration resulting from the disease that stimulated Gary's loss, but rather the absence of programming which caused the regression common to other SPI children.

b. *SED Children*

Resembling the SPI population, many SED children are reported to experience serious regression when their educational programs are interrupted. But unlike SPI children, SED students' regression is not normally confined to a breakdown in skill level; often, regression will occur in emotional development.

Professionals working with Richard H., Mark Anderson and Patricia Battle have all noticed and testified to in connection with interruptions in these children's education, a decrease in appropriate behaviors, as well as skill level, and an increase in inappropriate behaviors and emotional problems. There is no reason to doubt the accuracy of their testimony on these issues.

With the exception of one month at Evans School, Richard H. was without an educational program from June 1976 to January 1978. During that period his behavior deteriorated substantially. Based on this information, as well as other data about Richard's behavior and emotional problems, plaintiffs' experts predict that breaks in programmings will cause Richard increased anxiety and recurrence of severe disruptive and inappropriate behaviors.

Mark Anderson experiences regression during a break and before it, if he is aware that it is going to occur. While at Devereux Mark has made progress in controlling some of his inappropriate behaviors, but when he comes home, even for two or three days, many of the inappropriate behaviors, such as stuttering and enuresis, which have been under control, often return. In addition, he returns to school a more tense and closed individual.

When Patricia Battle attended The Woods Schools as a residential student and went home over a break, she returned to school confused and less in touch with reality than when she left. Since leaving Woods in September and being without any programming, Patricia has suffered serious regression reverting to a fantasy world.

Again, defendants' experts do not seriously question plaintiffs' assertion that often SED students suffer regression during breaks in programming. But they do challenge plaintiffs' on the issue of causation. Defendants contend that regression, if experienced, is not caused by the absence of programming, but rather by the same factors that they asserted caused SPI children to regress: teacher incompetency, non-functionality of skills and failure of parents to work with their children to maintain skills. For the reasons stated with regard to SPI children, the Court rejects defendants' argument.

SED children frequently share with the SPI population difficulty generalizing skills. As discussed earlier, this problem may partially explain, the significant regression that some SED children experience. And for SED children their emotional problems combined with programming breaks may also cause regression. For instance, when changes in environment cause a child serious emotional repercussions such as tantrums, ritualistic behavior, and withdrawal, it is not surprising that a break in programming, which completely alters the child's environment, may trigger emotional deterioration. Therefore, from all the evidence the Court finds that regression is often caused by interruptions in the SED child's educational programming.

2. *The Time Required to Recover from Regression Caused by Breaks in Programming*

Having determined that some SPI and SED children significantly regress during

breaks in programming, and that they do so to a greater extent than normal children, the next question is how long does it take them to relearn or regain what they lost. Again, there are no statistical studies to guide the Court, requiring it to ground its findings upon expert testimony.

Based upon the experts' opinions, the Court finds that the rate of relearning for all types of children—SED, SPI and non-handicapped—differs from child to child. The time needed to regain lost skills may differ dramatically, even among children who suffer from the same disability and have had similar losses over the same period. Some SPI and SED children return to their pre-break level in a period as short as two weeks, even when they have lost a significant amount of their skills, and then there are other children for whom the process will be long and arduous, consuming sometimes in excess of nine months. Other SPI and SED children will take a month to two months to return to their former level.

Undoubtedly, the rate of relearning is affected by a number of factors, including those that were found to affect learning, as well as the amount and type of regression that the child experiences and the length of time without programming. The evidence also establishes that just as normal children regress less than SPI and SED children do during breaks, they recoup their losses at a faster rate than these handicapped children. SPI and SED children can take months to return to their pre-summer level of skills, but the normal child, if he or she has had a loss, regains lost skills in a few weeks, almost never taking more than a month to do so.

Neither regression over breaks in programming nor long periods of time to regain lost skills are a certainty for the SPI or SED child. Nevertheless, the evidence convinces the Court that some of these children will experience both.

### 3. The Effect of Programming Breaks on the Educational Development of SPI and SED Children

After reviewing the evidence, the Court is convinced that there is no simple answer to the question of "what effect do breaks in programming have on the education of SPI and SED children?" In fact, it is clear that there is not one answer for all children. For some, there is little or no regression during a break of two to two and one-half months. Others experience substantial regression. The time required to recoup lost skills varies from child to child. And so do the effects of the combined regression and time required for recoupment. What may be a significant loss of skills and time required to regain them to one child may not be to another, depending upon the nature of their disabilities, educational programs and forecasts. For example, a child who has a significant amount to learn before being able to function outside the institution may find a loss of skills which takes two months to regain more detrimental to educational development than a child who loses the same amount of skills which will be relearned over the same time period, but is already prepared to live in a community living arrangement and work in a sheltered workshop.

Nevertheless, plaintiffs have proven through the testimony of their expert witnesses and the experiences of named plaintiffs that one answer is that for some SPI and SED children, including the named plaintiffs, interruptions in programming, because of regression and the length of time it takes to regain lost skills and behaviors, render it impossible or unlikely that they will attain that state of self-sufficiency that they could otherwise reasonably be expected to reach. Although defendants' expert witnesses questioned the validity of plaintiffs' contention that the SPI and SED child's regression is a result of the absence of programming, they did not challenge the theory that severe adverse effects on the child's chances of becoming as independent and self sufficient as otherwise possible result from the loss of important skills and behavioral regression which are not reclaimed for a long time.

As noted earlier, for Gary Armstrong the educational goal is much less lofty then

with other SPI children who do not suffer from degenerative diseases. Keeping Gary deinstitutionalized by maintaining his mobility and good behavior is the goal the educators have set for him. The substantial regression that Gary experiences with regard to behavior when his programming is interrupted followed by the extensive time (in some instances nine months) required to recoup those losses makes achieving that goal very difficult. Significantly, all personnel that have worked with Gary have recommended that he be given in excess of 180 days of education, and representatives of the School District prepared an addendum to Gary's IEP which stated that Gary's program should not be interrupted for more than two to three weeks. From the evidence the Court only can conclude that Gary is an individual who, if he is to be controlled and thereby given a chance to stay out of an institution for as long as otherwise possible, must be provided with an educational program in excess of 180 days.

The uncontradicted testimony of plaintiffs' experts is that at the completion of their schooling and with proper educational programming it is possible for the remaining named plaintiffs to live outside the institution in some kind of community living arrangement or family setting and, for some of them, to work in a sheltered environment. But the Court finds that if these individuals are not given a program in excess of 180 days it is likely that they will not attain these goals.

Since 1970, Natalie Bernard has received summer programming at Elwyn, and since 1973 has been a full-time residential student there, occasionally visiting home. During the summer, the Elwyn program is much less structured than that offered during the "normal" school year; nevertheless, work is still done on development of leisure and self help skills, areas in which Natalie is severely lacking. Defendants called Paul Charles Richardson to testify as to Natalie's need for the summer program. He has a Masters' Degree in special education and, as Director of Special Education at Elwyn, has had frequent contact with Natalie. Although he does not believe that a program in excess of 180 days is necessary for Natalie's development, his opinion is based not on his specific evaluation of her but only on his subscription to the general theory that handicapped children quickly relearn things that they have forgotten. As the Court has rejected the indiscriminate application of this proposition to all SPI and SED children, it does not accord Mr. Richardson's testimony about Natalie's needs much weight, especially in light of contrary testimony of plaintiffs' witness and Elwyn's repeated failure to recommend a change in Natalie's year round placement. Dr. Gordon testified that, because of the regression Natalie would suffer if her educational program were significantly interrupted and the time it would take to regain those losses, Natalie needs more than 180 days of education if she is, at the completion of her formal education, to be able to live in a community home and work in a sheltered environment. The Court finds the evaluation and prognosis rendered by Dr. Gordon reliable, as it is based upon a review of Natalie's records, a personal interview with and extensive examination of her and is made by a person who has extensive experience in the field.

At Elwyn, Richard H. has made substantial progress with his behavioral and emotional problems. But regression from which he will not quickly recover is the predicted effect of breaks in future programming. Dr. Ruttenberg, who has had experience with Richard and many other children with emotional problems like Richard's, believes that Richard needs a controlled environment, with an uninterrupted program, to develop, before his schooling ends, the self-help skills and behavioral controls necessary for life in a supervised group home. If Richard has summer breaks the doctor reports that the regression that Richard experiences will render him unable to obtain that goal. Having already accepted that the losses Richard suffers during interruptions in programming cannot be quickly recouped, the Court finds no reason from the evidence to doubt

the experienced doctor's conclusion that breaks in programming will preclude Richard from becoming independent of institutional life.

So too is the Court's finding with respect to Mark Anderson. Mark is nineteen years old. Although, while at Devereux, he made considerable progress in coping with his emotional problem, continual strides will be necessary, if at the end of his educational program in two years, he is to live outside the institution's walls. His psychologist, Mark Vnucak, did not believe that Mark could reach that goal if he had to not only make this progress, but also recover from the regression that he experiences in connection with programming breaks. The Court accepts Mr. Vnucak's uncontradicted opinion.

Although Patricia Battle has regressed since leaving The Woods Schools, she still attends a sheltered workshop and manages to perform the tasks assigned to her there. While at school, breaks in programming resulted in Patricia's reversion to a fantasy world where learning was not possible. By maintaining her in an educational environment and providing her with psychotherapy, learning became possible and she gained the skills necessary to work in a sheltered workshop. From this, the Court concludes that without summer programming she would not have reached even this minimal state of independence.

The strong opposition voiced by defendants' experts to an educational program in excess of 180 days was partially based upon their belief that handicapped children, because of their inability to easily generalize, need time to function in their natural environment; they need the opportunity to employ what they have learned from their formal education in a more informal context that is likely to approximate their reality upon leaving school. Plaintiffs' witnesses agreed that, generally, handicapped children do need exposure to what lurks outside the institution. Based upon its understanding of the characteristics and learning process of SPI and SED children, gained from the trial of this case,

the Court believes that handicapped children usually should be given time to participate in and experience the world that we hope they eventually will inhabit. Nevertheless, and as plaintiffs' experts explained, an education in excess of a 180 days does not mean that these children are denied that opportunity. Plaintiffs do not contend that all children who need more than 180 days of education require 365 days in an institution. For many children the needs for an education in excess of 180 days and the opportunity to function outside of school can be accommodated by such arrangements as part-time school, weekends at home and other short breaks. But, given the disabilities from which SPI and SED children suffer, there may be some children who, for some period of time, need nearly complete isolation from the outside world or exposure to it only in limited doses. For example, Mark Anderson's psychologist indicated that at one time, when he could not cope with what lay outside the institution and would become nervous, frustrated and enuretic upon exposure, Mark was such a child, needing constant schooling. If SPI and SED children's individual goals are to be reached, flexibility, balancing of needs and willingness to meet them, are required, rather than unyielding rules.

Having found that the five named plaintiffs are children for whom an educational program in excess of 180 days is required if they are to reach the goals with respect to self-sufficiency that they otherwise could achieve, it must be asked who else needs more time than the normal school year for these purposes. Although the Court is convinced that there are other handicapped children with similar needs, it cannot identify them by disability or characteristics, nor for that matter establish specific guidelines for making that determination. The experts in this case disagreed on many areas, but there was one opinion uniformly shared by them, which was that each handicapped child has unique needs and will respond in his or her own way to a given situation. For the Court to point to one or a number of characteristics, traits or disabilities as

identifying those children who need in excess of 180 days to reach the educators' goals would be to ignore this universally accepted principle. Rather, the decision is one that must be made on an individual basis, by those familiar with the child.

Dr. Piper, a distinguished expert in the field, testified that SPI children requiring in excess of two months to regain skills lost over the summer should be provided a program in excess of 180 days. For the SED children, Dr. Ruttenberg also tried to establish guidelines. We testified that children who have not "developed a stable relationship, who have not developed a real image of themselves, who have not developed impulse control" need a twelve month program. The Court does not doubt that many children who fall within these categories might need more than 180 days of education if they are to reach the self-sufficiency goals reasonably set by their educators. But having accepted that each SED or SPI child has different needs and must be treated individually, the Court can neither accept that all handicapped children who fall within the experts' categories need 180 days or only those that fall within these categories need more than 180 days.

Similarly, the type and length of the program in excess of 180 days requires individual consideration. For example, during the summer of 1978, Gary Armstrong received educational programming for five hours a day, three days of the week. As he did not regress, that would appear sufficient to meet the goal of maintaining control over

him. But if his needs could no longer be met on this basis, an increase or change in programming would be required so his goals could be reached.

The ultimate factual finding that the Court makes is that defendants' 180 day rule precludes plaintiffs and those similarly situated from receiving an education that is likely to allow them to reach their reasonably set educational goals with respect to self-sufficiency, whether that be merely avoiding institutionalization or living in a community living arrangement and working in a sheltered workshop.

## III. THE LAW AND ITS CONCLUSIONS

Plaintiffs claim that the 180 day rule imposed by defendants and applied to them and the class they represent violates their rights under the Education for All Handicapped Children Act of 1975, 20 U.S.C. § 1401 et seq., Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 and the regulations promulgated under these statutes. In addition, they contend that defendants' policies and practices offend the Equal Protection and Due Process Clauses of the Fourteenth Amendment and state laws. The Court agrees with plaintiffs that defendants' have violated their rights and the rights of the class they represent under the Education for All Handicapped Children Act, and therefore, need not discuss or reach the questions raised under Section 504, the Constitution or state statutes.[4]

4. Although the Court considered addressing and deciding the issue of whether Section 504 of the Rehabilitation Act of 1973 would serve as an alternative basis for relief in this case, in light of the recent decision by the Supreme Court in *Southeastern Community College v. Davis*, —— U.S. ——, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), it has declined to so so. Briefs in this case were submitted before the *Davis* decision and, therefore, the parties have not had the opportunity to address the questions of what effect the decision has on this case and what guidance it gives to the Court in interpreting Section 504 and the regulations promulgated thereunder. Since it is not necessary to rule on the Section 504 claim to grant plaintiffs injunctive relief and to declare invalid the 180 day rule, which were the purposes of this phase

of the trial, and as the Court believes that it would be beneficial to have the parties' briefs on these issues before deciding the Section 504 claim, it will not rule on that claim at this time. If, at a later time when plaintiffs Bernard and Battle's damages claims are reached, it becomes necessary to address the Section 504 claims on the merits, the Court will request supplemental briefs in light of *Southeastern Community College v. Davis*. However, before the Court would address the merits of the Section 504 claim and require those briefs to be submitted, it would have to be convinced that these plaintiffs could not secure complete relief under the Education for All Handicapped Children Act and that Section 504 would allow, if they were to succeed on the merits, for recovery of compensatory damages. Similarly, the

A. *Plaintiffs' Claims Under The Education for All Handicapped Children Act of 1975.*

1. *Exhaustion*

Before reaching the merits of plaintiffs' claim under the Education for All Handicapped Children Act of 1975, the question of whether plaintiffs sufficiently complied with the Act's procedural requirements must be addressed. Defendants contend that they have not and that the Court lacks jurisdiction under the Act.

▮ The Court's jurisdiction over this claim allegedly is based on 20 U.S.C. § 1415(e)(4) which states that:

"The district courts of the United States shall have jurisdiction of actions brought under this subsection without regard to the amount in controversy."

The subsection provides that whenever a complaint has been received by a state or local educational agency or any intermediate educational unit receiving assistance under the Act from a parent or guardian "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate education to such child," 20 U.S.C. § 1415(b)(1)(E), "the parents or guardian shall have an opportunity for an impartial due process hearing" conducted by the state or local educational agency or the intermediate educational unit, as determined by state law or the state educational agency. 20 U.S.C. § 1415(b)(2). If that hearing "is conducted by a local educational agency or an intermediate educational unit, any party aggrieved by the findings and decision rendered in such a hearing may appeal to the State educational agency which shall conduct an impartial review of such hearing." 20 U.S.C. § 1415(c). Any party wishing to challenge the findings and decision made at the first mentioned hearing who does not have a right to appeal that decision to the state educational agency and any person aggrieved by the findings and decision at the second mentioned hearing is given the right to bring a civil action with respect to the complaint, which action may be brought in any state court of competent jurisdiction or in a district court of the United States. 20 U.S.C. § 1415(e)(2).

By these provisions Congress has required that state procedures be exhausted before the jurisdiction of the courts is invoked under the statute. And in this case, with the exception of the Armstrongs [5], none of the named plaintiffs nor the class members attempted to employ the state procedures to challenge defendants' policies. Of course, as the Court has already determined in its factual findings, any effort to do so would have been futile given defendants' instructions to its hearings examiners that they could not require an education in excess of 180 days to be provided. Plaintiffs argue that the futility of seeking relief from the state process excuses their failure to exhaust. In response, defendants contend that because the statute only provides for the court's jurisdiction to be established once the procedures have been followed, this Court has no power to expand its jurisdiction by recognizing an exception to the statutory requirements. This argument must be rejected.

▮ Courts have generally recognized that failure to exhaust administrative rem-

Court would demand that such a showing be made before it decided plaintiffs' constitutional and state statutory claims for the purpose of allowing it to rule on the damage issues, as it is contrary to established judicial practice to reach unnecessary questions of law and render advisory opinions, especially when they are of a constitutional nature.

**5.** It should be noted that it is not clear that even the Armstrongs' efforts to use state procedures would satisfy the Act, for although they requested a hearing at the local level and one was held, they did not appeal from that decision to the state agency. Surely, at the time, it did not seem that they needed to appeal, as the hearing examiner agreed that Gary needed summer programming, and it was not until later that the local agency refused to provide that education. Because of the Court's ruling on the futility issue, it need not decide whether the Armstrongs were required to appeal from the local agency's decision to the state agency before seeking judicial relief.

edies may be excused, allowing the individual recourse to the courts, when it is clear that pursual of the administrative remedies would be futile. *McKart v. United States*, 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969); *Porter County Chapter of the Izaak Walton League of America, Inc. v. Costle*, 571 F.2d 359 (3d Cir. 1978) *cert. denied*, 439 U.S. 834, 99 S.Ct. 115, 58 L.Ed.2d 130 (1979); *Howard S. v. Friendswood Independent School District*, 454 F.Supp. 634 (S.D. Tex.1978); *Fialkowski v. Shapp*, 405 F.Supp. 946 (E.D.Pa.1975). But judicial precedent is not the Court's sole source of guidance on the issue of whether an exception to the requirements of the Education for All Handicapped Children Act can be recognized based on futility. Clear legislative instruction exists. In addressing the Senate during its debate on the Conference Report on the Education for All Handicapped Children Act, Senator Williams, author of the Senate bill and Chairperson of the Labor and Public Welfare Committee, explained:

> "Mr. President, with regard to complaints, I want to underscore that exhaustion of the administrative procedures established under this part should not be required for any individual complaint filing a judicial action in cases where such exhaustion would be futile either as a legal or practical matter." 121 Cong.Rec. 37416 (1975).

During the House and Senate debates on the Legislation no one questioned the accuracy of Senator Williams' remarks. After considering this legislative history and the judicial reaction to exhaustion requirements in the presence of futility, the Court finds it appropriate to acknowledge an exception to the requirements of 20 U.S.C. § 1415 when resorting to state procedures clearly would be futile. To find otherwise, would impose upon the parents and guardians of handicapped children an unnecessary and unjustified burden when they are faced with situations where prompt relief is often required. As defendants admit that the Pennsylvania due process procedures would have been of no avail to plaintiffs, the Court holds that named plaintiffs' and the class's failure to exhaust state remedies does not bar this suit.[6]

## 2. The Education for All Handicapped Children Act and the 180 Day Rule

For state educational agencies, the Education for All Handicapped Children Act serves both as a source of funds and of obligations. Besides supplying them with federal monies to help support the education of handicapped children, the Act imposes certain duties on these state agencies and the local and intermediate educational agencies which receive funds from them. One of the major responsibilities of these agencies is assuring all handicapped children provision of a "free appropriate public education," 20 U.S.C. § 1412(1). And, under the Act, these children's parents and guardians have a right to secure its provision. 20 U.S.C. § 1415. By defendants' inflexible application of the 180 day rule, plaintiffs claim that defendants have failed to meet their responsibilities under the Act and deny plaintiffs and members of the class the right to a free appropriate public education. Although at least one other court has commented on the issue[7], this appears to be the first occasion that a court has had to decide whether the Education for All Hand-

---

6. Since named plaintiffs' and the class's failure to exhaust administrative remedies is excused by futility, the Court need not decide whether individual class members, in other circumstances, must exhaust state procedures. Nevertheless, from the legislative history, it would seem that such a requirement would not be imposed under the Act. Continuing his remarks from the ones quoted above, Senator Williams stated:

   "Nor is it intended that the availability of these administrative procedures be construed so as to require each member of the class to exhaust such procedures in any class action brought to redress an alleged violation of the statute." 121 Cong.Rec. 37416 (1975).

7. *In the Matter of Scott K*, 92 Misc.2d 681, 400 N.Y.S.2d 289, 291 (Fam.Ct. 1977), in dicta, the Court indicated that under this Act and regulations the appropriate governmental body could be required to provide a handicapped child free residential placement for the full twelve months of a year, if the needs of the child required it.

icapped Children Act requires the state, and its local and intermediate units, in at least certain instances, to provide an education to handicapped children in excess of 180 days.

Simply put, the issues are what is an appropriate education under the Act and does the 180 day rule interfere with its provision. The Act defines a "free appropriate public education" as:

> ". . . special education and related services which (A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary or secondary school education in the State involved, and (D) are provided in conformity with the individualized education program . . ." 20 U.S.C. § 1401(18). *See also* 45 C.F.R. 121a.4 (1978).

The Act's definition of "special education" gives further guidance as to what an appropriate education consists of:

> "The term 'special education' means specially designed instruction, at no cost to parents or guardians, *to meet the unique needs* of a handicapped child, including classroom instruction in physical education, home instruction, and instruction in hospitals and institutions." 20 U.S.C. § 1401(16) (emphasis added). *See also* 45 C.F.R. 121a.14 (1978).

Although this additional statutory directive seems to clarify the ingredients of an appropriate education, it is still sometimes difficult to determine precisely what the state is required to provide.

By its terms, the Act appears to demand that the state supply instruction designed to meet all of the handicapped child's "unique needs" without limitation. But, even in light of this broad statutory language, defendants' contend that they must only offer instruction which satisfies certain of the child's unique needs, namely those which must be met so that the child can share and benefit from equal educational programming and services with non-handicapped students; defendants strongly deny that they must furnish instruction that meets needs that arise solely when the handicapped seek to reach their maximum potential. Plaintiffs obviously disagree.

To determine which unique needs of the handicapped child must be met by the special instruction, thereby allowing the Court to resolve what instruction is necessary, it is useful to approach the problem by asking what is the goal of the education that the Act requires the state to provide. Needs arise in context of achieving certain ends, and surely there are certain ends, and not others, that are the concern of this legislation. Therefore, the Court must resolve whether the purpose of the special instruction mandated by the Act is to allow these children to reach their maximum potential, to permit them to share equally in programs provided to non-handicapped students or to reach one or several other goals.

Although the statute does not directly speak to this question, the legislative history does. This legislation was considered and enacted after the landmark decision in *Pennsylvania Association for Retarded Children (PARC) v. Commonwealth of Pennsylvania,* 334 F.Supp. 1257 (E.D.Pa.1971), where the court guaranteed handicapped children a right to a free publicly supported education and recognized that:

> "all mentally retarded persons are capable of benefiting from a program of education and training; that the greatest number of retarded persons, given such education and training, are capable of achieving self-sufficiency, and the remaining few, with such education and training, are capable of achieving some degree of self-care." *Id.* at 1259.

By enacting the Education for All Handicapped Children Act, Congress sought not only to aid the states in their provision of an education to handicapped children, but also, as articulated by the congressmen most intimately involved with the legislation, to achieve equal educational opportunity and to allow handicapped children to achieve at a minimum what the *PARC* court found possible for most: self sufficiency and independence from caretakers.

Throughout the debates, there · are repeated references to this latter goal. Senator Williams, when the Senate was considering on June 18, 1975, the Senate version of the Act, explained:

"Failure to provide appropriate educational services for all handicapped children results in public agencies and taxpayers spending billions of dollars over the lifetime of these individuals to maintain them as dependents in minimally acceptable lifestyles. Yet, providing appropriate educational services now means that many of these individuals will be able to become a contributing part of our society, and they will not have to depend on subsistence payments from public funds." 121 Cong.Rec. 19492 (1975).

And later, in the debates concerning the Conference Report on the Act, he agreed with the Secretary of Health, Education and Welfare, that the purpose and goal of the Act was to allow handicapped persons to be "productive citizens, capable of contributing, and even more, capable of self-respect and pride which they so rightly deserve." 121 Cong.Rec. 37416 (1975). In the Senate and in the House, his sentiments were echoed. The Senate Report, in its discussion of the need for legislation concerning handicapped children's education, indicated at least one of the goals towards which educational services to the handicapped were to be directed.

"With proper education services, many would be able to become productive citizens, contributing to society instead of being forced to remain burdens. Others, through such services, would increase their independence, thus reducing their dependence on society." S.Rep. No. 94–168, 94th Cong., 1st Sess., *reprinted* in [1975] U.S.Code Cong. & Admin.News, pp. 1425, 1433.

Senator Randolph, recognizing the potential of handicapped children, implored in his discussion of the conference bill, that "[w]e must act now to give these children the educational services they need to compete in today's changing world." 121 Cong.Rec. 37410 (1975). And in the House, Congressman Harkin reiterated these thoughts when he stated:

"With proper educational services provided now, at a young age, these children can become productive citizens contributing to society instead of being left as burdens on our society." 121 Cong.Rec. 25541 (1975).

█ As noted, throughout the Congressional debates there is a strongly expressed concern for securing through education the handicapped child's achievement of self-sufficiency. This legislative history convinces the Court that, as do the educators of handicapped children, Congress recognized attaining self-sufficiency as a goal of an appropriate education for handicapped children and sought to secure it by enacting the Education for All Handicapped Children Act. The Court concludes, therefore, that the unique needs that must be met by the educational program include those that, if satisfied, allow the child, within the limits of his or her handicap, to become self-sufficient.

This standard for judging a state's program does not require the state to provide a program which is designed to allow each handicapped child to reach his or her maximum potential in every respect. Rather, it is limited to those areas with which Congress expressed concern. The congressional intent was to provide for that education which would leave these children, upon school's completion, as independent as possible from dependency on others, including the state, within the limits of the handicapping condition.[8]

---

8. By enunciating this standard, the Court does not mean to imply that it is the only one that is used to evaluate whether a program is "appropriate" and meets the "unique needs" of the handicapped child. Of course, Congress may have had other goals that it wished the educational program to satisfy (including allowing the handicap child access to the programs available to non-handicapped students) which may be considered in determining whether a program meets the unique needs of the handicapped child. In this case, as the 180 day rule prevents plaintiffs and members of their class from attaining that level of self-sufficiency that

Evaluating defendants' 180 day rule by whether it prevents defendants from providing a program of instruction designed to meet the unique needs of handicapped children in their quest for self-sufficiency, it is apparent, in light of court's factual findings, that the rule must fall and that it can no longer be inflexibly applied by hearing examiners in "due process" hearings if plaintiffs are to be afforded the procedural safeguards provided for in the Act. *See,* 20 U.S.C. § 1415. As the Court found earlier, for certain handicapped children, including named minor plaintiffs, a program in excess of 180 days is required if they are to attain that level of self-sufficiency that is otherwise possible given an appropriate education.

■ Defendants cannot defend their 180 day rule by asserting that it is applied equally to handicapped as well as non-handicapped children. Equality of services and programs is not the test for determining whether an appropriate education is being provided by the state. The Act explicitly, in a number of instances, requires that the state provide services to handicapped children that it does not give to non-handicapped children, e. g., hospital and home instruction, *see* 20 U.S.C. § 1401(16), and also instructs, without mentioning the services provided to normal children that an educational plan be developed on an individual basis with attention paid to the handicapped child's needs. It is apparent that Congress recognized that "equal" services does not always provide handicapped children with an "appropriate education" and, thus by requiring defendants to meet the handicapped child's "unique needs", demanded that, in certain instances, more be provided.

■ Therefore, the Court must declare that the 180 day rule deprives plaintiffs and the class they represent of an "appropriate education" and violates the Education for All Handicapped Children Act. This decision necessitates certain injunctive relief, such as instructions to hearing officers and notification to parents. The Court will direct counsel, the parties, and their experts to discuss these issues and if possible, submit a joint proposed order on class wide injunctive relief that is consistent with this decision. It is not clear to the Court, what relief can be offered to plaintiff class for this summer; the parties should also explore this question and report to the Court on it.

As named plaintiffs have proven their need to an education in excess of 180 days, defendants will be ordered to provide one to each of the named plaintiffs except for Patricia Battle, who is no longer entitled to a public or publicly funded education. Although the Court will be willing to meet with counsel to discuss the length and terms of these named plaintiffs' educational program and issue an appropriate order, again it will instruct the parties to meet as quickly as possible and submit a joint plan, if possible, that adequately meets these children's needs.

The Court has found all counsel extremely cooperative and understanding of the issues and their importance. Therefore, by asking them and the parties to discuss with the educational experts the appropriate relief that should be ordered in this case and to report their conclusions to the Court, the Court, whose ultimate responsibility it is to enter a final order in these cases, anticipates that it will be able to render more effective and more appropriate relief.

they could otherwise achieve given their handicap, there is no need to discuss other goals and standards by which an educational program is to be judged.